HOLLADAY et al. v. LAND & RIVER IMP. CO.

(Circuit Court of Appeals, Seventh Circuit. October 2, 1893.)

No. 58.

PARTNERSHIP—SETTLEMENT—EQUITY—LACHES.

After the death of one of two copartners engaged in land speculation, a settlement of the copartnership affairs, which had been begun during the lifetime of the deceased partner, was consummated by his executor and the surviving partner, and a deed of the land given by the executor to the surviving partner. The executor had been the confidential agent of the

deceased partner for years, and was especially charged in the will with the duty of settling up the deceased partner's affairs. *Held* that, in the absence of proof of actual fraud, the settlement thus made was conclusive on the heirs and devisees of the deceased partner, when attacked for the first time nearly 24 years after the settlement, and after the executor and the surviving partner were both dead, and all books and papers relating to the partnership affairs had been destroyed: Woods, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Western District of Wisconsin.

In Equity. Suit by the Land & River Improvement Company against Lavinia H. Holladay and others to quiet title to certain lands. Decree for complainant. Defendants appeal. Affirmed.

Statement by FULLER, Circuit Justice:

The Land & River Improvement Company, a corporation organized under the laws of New Jersey, filed its bill of complaint in the United States circuit court for the western district of Wisconsin on the 4th day of September, A. D. 1890, to quiet title to lots 1 and 2, and the S. W. ¼ of the N. E. ¼ of section 14, in township 49, range 14 W., in the county of Douglas and state of Wisconsin, containing 113.80 acres, against Lavinia H. Holladay, Jesse Holladay, Minnesota E. Tytus, John B. Tytus, Charlotte E. Webb, William F. Webb, and George W. Ewing, the heirs and legal representatives of George W. Ewing, deceased. The bill set up a partnership for dealing in real estate between Madison Sweetser and George W. Ewing and claimed the entire interest in the lands in controversy, under Madison Sweetser, through a settlement with the executors of George W. Ewing, in pursuance of which a deed of Ewing's interest therein was given by them to Sweetser, dated December 11, 1866. The answer admitted the partnership, but asserted title to an undivided one-half interest in the real estate; it being contended that the deed of December 11, 1866, was unauthorized, fraudulent, and void. By stipulation, it was agreed that defendants might have the same relief upon their answer as if they had filed a cross bill.

The original agreement between George W. Ewing and Madison Sweetser bore date May 25, 1855, and read as in the foot-note.[1]

[1] Whereas, the said Madison Sweetser has, as shown by his statement dated the 21st inst., and hereunto attached, contracted for and partially secured the right and title and ownership of certain half-breed Sioux Indian lands, and also hopes and expects to secure the right, title, and ownership, by pre-emption or squatter or claim title and otherwise, to certain other lands at Traverse des Sioux, and at other points and places within the territory of Minnesota, and in other states and territories; and whereas, the said Sweetser is desirous of securing the co-operation and advice and assistance of the said George W. Ewing, party of the second part aforesaid, in consummating and securing said purchase of lands, lots, etc., now partially secured, and which he may hereafter secure, directly or indirectly:

Now, then, therefore, be it known that we, the said Madison Sweetser, party of the first part, and the said George W. Ewing, party of the second part hereto, do and have, this day and by these presents, entered into this agreement for the purpose of making and consummating said purchases and said claims, and of such other lands and lots as they may deem it advisable to purchase and secure in said territory of Minnesota and elsewhere. The said Sweetser will spend most of his time up in Minnesota territory, and will give this land business his personal attention; this being deemed important and necessary in effecting purchases from half-breeds and others, and also in perfecting the claims which he has or may hereafter make or purchase or trade for, or otherwise procure, from or through other persons. And more especially is it important and necessary that the said Sweetser shall watch closely, and give his personal attention to securing and consummating and perfecting the title to the lands and lots now and hereafter to be claimed by him at and near the town of Traverse des Sioux, in Nicollet county, in the territory of Minnesota, and also the claim made at Swan lake, in said territory. These said claims and purchases, and any and all other claims and purchases, or rights or titles, obtained, procured, and to be procured hereafter, by the said Sweetser, either directly or indirectly, whether in his own name or in the name of the said Ewing, or of any other person or persons, are all to belong, jointly and equally, to the said Madison Sweetser and to the said George W. Ewing, each to own and to have

The statement attached was dated May 21, 1855, and signed by Sweetser, who therein asserted: "In the treaty with the Sioux of July 15, 1830, and ratified February 24, 1831, provision is made for the half-breeds of said Indians in article 9; for a tract of country, say thirty-six miles long by fifteen wide, containing say 540 sections or 551,640 acres of land. I now control five miles, or the interests of five half-breeds, to wit, A. J. Campbell, Scott Campbell, Batrice Campbell, Rosaline Campbell, and Hyppolite Campbell, &c., &c."

the one equal half thereof, and they are to be so held in trust one for the other. And upon request the titles are to be made so (one to the other, as the case may be) by executing proper deeds or other bonds or conveyances, or, if held for joint and mutual benefit, then the party holding any such title, shall, upon request, give and make to the other the proper and necessary declaration of trust, fully stating that fact. This may be desired where the said parties mutually agree to sell, or hold for sale, any particular tract or part of tract. Where they do not agree to sell, then the titles shall be made equal half to each, in the way and manner hereinbefore provided.

This agreement for purchasing and securing lands for joint account through the personal attention of the said Sweetser is to continue for three years, unless sooner discontinued by mutual agreement of the parties. It is believed that $3,000 will be all that will be required to enable the said parties to secure what joint lands they now have in view. If, however, they find it profitable, and they are able to do so, and willing, they can increase the aggregate amount of their joint purchases and joint investments. Each party is to advance his equal half of the funds necessary to make their joint purchases contemplated by this agreement; and, should the said Ewing advance more than the said Sweetser does, then and in that case the said Sweetser will have to reimburse him the one-half thereof, with interest thereon. If found advisable, some of the lands and property thus jointly procured may (both parties consenting thereto) be sold, and the proceeds be equally divided, or again reinvested in lands or town property on joint account. The funds advanced by either party for making any of these said joint purchases, or for defraying necessary expenses, etc., shall in all cases be refunded to the party advancing the same, with interest thereon, as soon as the same can be realized from sales of any of the joint property.

The said Sweetser to open and keep a set of joint land books, and keep regular accounts showing all proper expenses and costs of making purchases, securing claims, etc., and he will take necessary vouchers for all moneys, etc., paid out for and on account of this said joint property, real-estate business, where the amount exceeds say $20, all of which he is to report and submit to the said Ewing for his examination, and whenever called on so to do; and, also, he is to report to the said Ewing, from time to time, each and every purchase, when and as made, showing what it is, its cost, description, and what the title is, how derived and how held, etc., and that the same is for and on account of this said joint land business. At the expiration of this said agreement, or before,—that is to say, when it is discontinued, and brought to a final close,—then, if not done before, all the debts due from the joint concern to either the said Sweetser or the said Ewing, or to any other person, must be settled and paid; and then the lands, lots, or other joint property, and any and all moneys or notes or bonds or other things, belonging to the said joint real-estate business, must be equally and fairly divided between the said Sweetser and the said Ewing, each to have and own the equal one-half thereof.

It is understood that the said Ewing is not expected to give their joint land business any of his personal attention in Minnesota territory, or where any of the said joint purchases may be made, (as this part of the business is to devolve on said Sweetser;) but the said Ewing is to aid by advising and corresponding with said Sweetser. when called on so to do, and he is to assist in anything that may require attention at Washington city, or elsewhere where he may be, so far as it may be in his power so to do. And it is expected that the said Sweetser and the said Ewing will consult and correspond fully and freely in relation to all they do in this joint land-purchasing business.

All necessary expenses incurred by either party in attending to this joint business shall be mutually borne and paid by them jointly, and, of all these and all other outlays and expenditures, the parties are to keep correct accounts and make full exhibits, one to the other, upon request.

If the title to any joint property procured under this agreement shall be in the name of Madison Sweetser aforesaid, or George W. Ewing aforesaid, the same shall be held in trust by the one holding it, and half of the same shall belong to the other; and, if any titles shall be in the name of any other person or persons, it is to be for the said Ewing & Sweetser and in trust for them, and the half thereof to be surrendered and made over to either, upon request from them or either of them, or from their legal representatives.

And it is further agreed that the said Madison Sweetser is to have and be allowed for his said personal services and attention to this said joint land business a salary of $600 per annum, to be taken from the joint funds, so that said Ewing will pay the one-half thereof, or $300 per annum, as his part of said salary.

August 12, 1857, a supplemental agreement was executed by Sweetser and Ewing, as given below.[2]

[2]The purchases and arrangements and negotiations for purchases, and interests, made and making and in contemplation by the said Madison Sweetser, under our said annexed agreement, being larger and more extended than was at first contemplated, and the said George W. Ewing having advanced to said Sweetser, in all, a much larger amount of money than it was first supposed would be needed, (the amount so furnished, up to this date, being eight thousand dollars, or more, as said Sweetser's several receipts to him therefor will show,) and the said Ewing may (if needed, and he feels willing hereafter to do so) advance some more money, and as some of the half-breed lands and town-site property already purchased have been and can and may be sold by the said Sweetser, if deemed advisable, and thereby add to our cash means, it is now thought advisable, and agreed to between us, that the said Sweetser shall continue to extend and add to our said joint land and town property purchases, either by increasing our shares and interests, direct and indirect, in town sites, or in the Dakota or other land companies and associations formed or forming here or elsewhere for the purpose of securing lands and town sites in this territory and elsewhere, by making settlements thereon, or by pre-empting, or by claiming under the general town law or under licenses to trade with Indians, or by laying on half-breed Sioux Indian land scrip upon the government lands, or in any other way or manner deemed most advisable to secure the same, or any shares or interest therein. And it may be well to purchase a few more of the said half-breed Sioux land scrip, or to purchase lands or town property, in some way, so far as the joint means within said Sweetser's hands now or hereafter may enable him to do, and in this way prudently to extend and add to our joint real-estate interests under our existing agreement, which the said Sweetser can do with the concurrence of the said Ewing.

The joint Wabasha interest, our large interest at and near Traverse des Sioux, Swan lake, and half-breed Sioux Indian land, and town sites and lands, thus far secured and contracted for (under our agreement) by said Sweetser, it is hoped, will result favorably; and the said Sweetser is to aim to perfect, as fast as practicable, our titles thereto. He is to cause our land scrip to be located to the best advantage, and, when necessary to accomplish this, he can sell an interest in a part, say one-half, at say five dollars per acre, on like terms as he is about arranging with Messrs. Gilman and Wait. Our Wabasha interest is believed to be, prospectively, quite valuable, and this is to be carefully looked after, in order to enable said Sweetser to consummate all of said purchases, and the titles thereto, and also such other purchases as he may make, and to secure other landed and town-site interests as herein, and under our original agreement, are contemplated. It is agreed to continue and extend our agreement two years longer, which will make it terminate on the 25th day of May, eighteen hundred and sixty, (1860,) unless the same should be previously discontinued by consent and agreements between the parties, or by the death of one or both of them. And for all the time this agreement shall continue in force from and after the 25th day of May, A. D. 1858, the said Sweetser is to be allowed for his services at the rate of ten hundred dollars per annum, instead of six hundred dollars, which is his salary under the original agreement, and payable in the same way and manner. As the said George W. Ewing is not expected to be the resident or acting partner under this joint real-estate agreement, nothing herein contained shall be so construed to preclude or prevent him at any time, should he desire to do so, from purchasing real estate for himself or for other persons with his own or their funds, within this (Minnesota) territory or elsewhere, during the existence of this agreement, but in doing so he would not, of course, interfere with any purchases which the said Sweetser might desire to make for the joint interest under this agreement; and, should the said Sweetser desire to purchase some residence property for himself with his own individual funds, he can do so, not interfering with purchases made for joint account. Should either or both of the parties to this agreement die before the business under it is finally closed up, it is believed and intended to have it so full, plain, and explicit that their legal representatives could go on and close it up fairly, and carry out our intentions, as meant and intended by us, in good faith, which is to say that half of all the profit or gains, either in property or money, or whatever may be remaining on hand, (after the joint debts are paid, and all moneys advanced by either are paid back with,) shall belong to each, and shall be so made over promptly and in good faith. Most, and perhaps all, of the titles, agreements, obligations, growing up in this business, will be made in the name of Madison Sweetser, the acting partner. These he will hold in trust for himself and for said Ewing, or his legal representatives or assigns, all of which he is to surrender and make over upon request, as stipulated and provided in this agreement. Said Sweetser being a resident and active party in this real-estate business, it is thought best that the titles and other papers shall be made to him, and in his name, to facilitate the transaction of the business. In all large and important transactions of either purchases or sales, the said Ewing is to be first consulted, and his consent obtained, before making the same, unless where there is an emergency, and it would be unsafe to defer it for this purpose.

March 3, 1860, the lands in controversy, the legal title to which was in Hyppolite Campbell, were conveyed to Ewing by Sweetser under power of attorney from Campbell. July 28, 1860, Ewing attached to certain lists of lands, including those in controversy, the following memorandum under his hand and seal, witnessed by William Lytle and B. D. Miner, and acknowledged that day before Lytle as notary public: "The foregoing described lands and real estate, lying in the states of Minnesota and Wisconsin, were acquired by Madison Sweetser as per agreement between him and myself dated 25th of May, 1855, and the subsequent amendments thereto; and they are now deeded to me by said Sweetser in trust for himself and me jointly, subject to all the conditions contained in said agreement and amendments thereto."

During the latter part of 1865 and the early part of 1866, Mr. Ewing seems to have been urging Sweetser for a full settlement of all their transactions. January 7, 1866, Sweetser wrote Ewing a letter, in which he said: "You propose to sell me your interest in our landed operations under our agreement for original cost and interest. I now accept your proposition, and will be ready as soon as time will permit us to examine the matter, and determine the amount. With this view, I wish you would have Mr. Lytle prepare a statement of account, including only such as properly belong to expenditures for real estate."

January 30, 1866, B. D. Miner, acting as the agent for Ewing, wrote to Sweetser, stating that Col. Ewing continues in ill health, and "is very anxious to close out all business affairs with you and all others; and, with this view, he has fully empowered me to arrange his affairs so as to make full and complete settlements of all his unsettled affairs. Acting under this authority, I now propose that he shall quitclaim to you all of the interests he may have acquired by conveyances made to him by you, as attorney for other parties, of lands in Minnesota and Wisconsin, described as follows, to wit, [then follows a list of lands, not including those in controversy,] at and for such sum as may be agreed on between you and I. You will therefore, if you wish this matter settled, state what you will give in cash down, or on short time with approved security, for such quitclaim. You, better than any one else, know what the property is worth. This complicated matter must be adjusted in some way or other, and I am determined that we will be rid of the annoyance and perplexity attending it, and have already, according to previous notice to you, ceased paying taxes. If you make such a proposition as is acceptable, I shall require of you the surrender of the declaration of trust, and the canceling of the original agreements and amendments, and a release from all further claims against Colonel Ewing on account of the same, so that we may be relieved from all further trouble, litigation, or expense in relation thereto. If you make such a proposition as may be acceptable, the proceeds, when and as paid to me, will be used to refund to Colonel Ewing, as far as it may reach, the large amount of money which he has furnished you, from time to time, to be invested in that country. This proposal to be good for 30 days, and no longer."

By letter of February 8, 1866, Sweetser withdrew the offer contained in the letter of January 7th, and, referring to the fact that it had been stated by Miner and Ewing that, by their operations, Ewing and Sweetser had failed to acquire title to any property, said: "I accept that as the conditions of that concern, with the remark that this result has been reached by refusal to carry into effect the written and implied agreements to furnish means. * * * If you will make me a proposition what Mr. Ewing will take for all interest acquired, whether personal or real, by Ewing and Sweetser, I will then consider the matter. * * * If neglected much longer, all will be lost. Remember, I do not propose to purchase a release of the lands alone mentioned in your schedule. I mean all acquired by Ewing and Sweetser, whether in his or my name. You should know that I know what they are, and, when you furnish me another list, let it be a correct one. You understand me; to make your proposition for all your interest; and let your communications be confined to business, if you expect them to receive attention."

A letter from Sweetser to Ewing followed on the 17th of March, in which he protests that the letter from Miner of the 30th of January does not give a schedule of all their joint property, and says: "I understand you desired to get rid of all our matters. This is the only way I can conceive to settle the matter. Do you desire to sell or purchase all our interests? If so, what will you take, or what will you give? I will be prepared in the spring to close the matter in some form. I cannot consent it shall rest as at present. I cannot afford to give my time and furnish money to pay the expenses for taking care of the property. If there is no other way, the property must be sold to pay the debts; but I will either purchase or sell, and arrange the matter to relieve you of further trouble. It strikes me we should be able to do this, in and of ourselves. With this view, will you have a full and complete account made of your expenditures in our joint interest, and forward the same to me? * * * I propose to sell all, or purchase all; not a part. Close at once all interests, for we have been quite long enough joint owners. and I understand this to be your wish. At least, you have so stated repeatedly. * * * Let us, in good faith, close."

March 26, 1866, Ewing wrote to Sweetser, (the letter being in the handwriting of William Lytle, but signed by Ewing,) saying: "Under my special direction, Mr. Miner, my general business agent, on the 30th of January last, made you a written proposal in reference to the affairs of Ewing and Sweetser in relation to lands in Wisconsin and Minnesota. He has not assumed any authority not vested in him. The list of property furnished therein was full and complete, except as to that then and now in litigation. You were requested to affix to each tract such a price as you were willing to pay therefor. This was done at your suggestion, as you have frequently stated to me that you desire to purchase my interests. I know of no better way for you to acquire my interest. The offer of the 30th of January last, above referred to, was made in good faith, and I expected that you would affix to the descriptions such prices as you would pay for them, if they are of any value. I have already notified you that I will not furnish any more money to be used in any manner connected with that real-estate business. I have furnished you with a large sum of money, and have had no returns. The title to the lands described in the schedule furnished you on the 30th of January last, by you put in, are mainly worthless. Where the titles are not worthless, the property is. This is the condition in which I find myself, after having expended so large an amount of money. I now ask you to take back your titles, and surrender to me the declaration and agreements between us in relation thereto. You can have your titles at your own price, and on your own terms. What remains, not included in the schedule, can be settled hereafter. I have determined to rid myself of all mixed interests, and with this view I made you the offer of the 30th of January last, which I now renew. If not arranged within the next sixty days, I shall sell the property for whatsoever it will bring, and apply the proceeds to the payment of the debts of the concern."

March 30, 1866, Sweetser wrote to Ewing and Miner that he had had an interview with a gentleman from New York on the subject of purchasing Mr. Ewing's interest in the affairs of Ewing & Sweetser; that he supposed Mr. Ewing proposed, in good faith, to sell his interest at cost and interest, to save his advances, which might be lost unless protected, "which he declines aiding to do to save his interests, as well as to protect, to some extent, my labor and advances. I have been trying to protect all by a sale, with the promise to further labor, if the sale should be made, to develop the property. This is a matter of business, and not favor. Do you still desire to sell? And, if so, I am authorized to offer you your entire advancement, with the interest; to pay you $5,000 in hand; notes, with interest, and bond and mortgage, for payment of the balance, with such payment as you may agree upon. I can, by sacrifice, make this arrangement. Do you accept? I am prepared to make any sacrifice to close this whole matter. The gentlemen gave me 15 days for answer."

On the 6th of April, Sweetser wrote Miner that he desired to purchase all of Ewing's interest, not a part; but, referring to the letter of January

30th, he would say that he would give Ewing $100 for all the property mentioned in the list of that date. On the same day, and in answer to a letter from Miner, Sweetser wrote, "I am not able, if I were disposed, to make the purchase; but since I came east I have given the subject my attention, to carry out what Mr. E. said he was desirous of doing, and what I said I would do, i. e. pay him his money with interest. I have been negotiating for that purpose; not to make money myself, but to get him out, as he seemed to desire, and to get other parties in his stead, who would do their part in protecting the property, and in the end save a small interest to myself, and to compensate me for years of expense and hard labor. Now, you and he can say to me, in a proper writing, that you will take the proposition of principal and interest with four or five thousand dollars in hand, and the balance in payments. Then I have something to act upon. But I must have a definite and certain something, to get gentlemen to advance their money. I am, in other words, negotiating for him. If something is not done, the property will go to waste. No one need expect me to do the work and pay the money. Should you agree to send me a written, fixed, proposition I will then be able to act. I have reason to know I can carry into effect my proposition to you. Any personal interest between us, I will arrange myself, in making out the cash advanced. I want included therein the last mortgage given him on my house. The concern owes me that amount, and more,—also, the $100 advanced me to go to New York, and attend the Bratt case."

Under date of April 8, 1866, Mr. Sweetser again wrote to Mr. Miner that the gentleman whom he had been expecting to purchase Mr. Ewing's entire interest had not returned, but that he hoped, through another party, to arrange the same matters, and said: "I will give you $20,000 for all interest he has in the Ewing and Sweetser matters, his releasing mortgage on my house and lot, excepting the original mortgage for the purchase money, which I will arrange besides, pay him down on the purchase say $4,000 or $5,000, and more, if I can; the balance secured by notes and mortgage on the property." Or, he says, he will give up all agreements and papers of every kind relating to the business, and release all interest in and to the property, by Ewing placing him where he was when he commenced. He adds: "I have borrowed some money, say $3,000, which has been expended in and about that business. The payment of any amount shown to be expended by me since this business commenced will apply to the payment of the original mortgage on my property, the balance to be paid me, whatever it may be. All I desire is to be placed in money and property where I commenced, with the loss of my labor for twelve years. Answer. Will you accept either proposition? I desire, as much as you or he, to have this matter closed, if it can be, and I have been laboring to that end for the last six months."

Ewing replied April 14, 1866. He refers to Sweetser's letters of April 6th and 8th, and says, referring to that of the 6th: "The proposition made you in January last by my agent, B. D. Miner, was made in good faith, and by it I will abide. So your proposition is accepted, and I will give you twenty days to make the payment. On the payment, I will quitclaim and relinquish to you all the interest that I hold in and to the property named in said schedule of January last, by your complying with the requirements and stipulations therein contained. I had hoped you would have come out to Fort Wayne, as proposed by Mr. Miner, when you and he could have negotiated, and closed up the whole matter. The proposition contained in your letter of the 8th, above referred to, I cannot accept. The security for the money I have loaned you at different times I consider amply good. Your note secured by mortgage on the property named in your list of January last would be of no value to me, as you have indicated in the offer you have made for it. I shall have the quitclaim deed prepared at once, and have it executed. I will leave it in the hands of my agent, B. D. Miner, at Fort Wayne, with directions that he deliver it to you on your complying with the requirements of the said January letter, which also contains the list of the property to be deeded you under this arrangement. I trust that

you will come forward without delay, and take back the worthless titles you have placed in me. What remains can be settled and adjusted by us at some future day, as I have heretofore advised you."

April 30, 1866, Ewing executed his quitclaim deed to Sweetser, embracing the lands set forth in the letter of January 30, 1866, by the same descriptions, not including the lands in controversy and some other lands, and reciting a consideration of $100. This deed contained 3,939.11 acres of land, and the deed of December 8, 1866, hereinafter referred to, embraced 543.80 acres, making 4,482.91 acres in all. The memorandum of July 28, 1866, covered 2,324.31, and 160 acres therein described were not mentioned in the subsequent transfers between the parties. The deed of April 30th was presumably left with Miner, and the exact day of its delivery was not shown by direct evidence.

On the 29th of May, 1866, George W. Ewing, who was a citizen of Indiana, residing at Ft. Wayne, died testate. His will bore date February 17, 1866, and was duly admitted to probate in Allen county, Ind., October 2, 1866, and in Polk county, Wis., October 5, 1866. Byrum D. Miner and William A. Ewing were appointed executors. Miner resided at Ft. Wayne; and Ewing, in Ohio. The fourth clause contained a description of certain real estate, which the testator directed to be improved and leased as should be deemed most advisable by the executors, and the income derived therefrom be paid one-third to each of his three children during their natural lives; and the disposal of the real estate was expressly forbidden during the life of any of the children, the same to be in the mean time "under the control of my executors." The sixth clause provided that the executors should, in order to carry out the trust reposed in them, first apply such of the personal estate as they may see proper, and then to make sale of such of the real estate as was not embraced in the fourth clause as should be necessary to carry out and effect the objects and purposes of the will, and thus continues: "Before making such sale or sales of real estate, the same shall be appraised by two respectable citizens of the vicinity of the real estate to be sold, and shall not be sold for less than two-thirds of the appraised value; and my executors are authorized and empowered to make all such necessary sales and conveyances without application to any courts for that purpose. And my executors are hereby also empowered to make conveyances for such real estate as I may have disposed of and not conveyed, and to receive the rents and the profits of all my real estate. And, also, my said executors, out of any moneys in their hands, arising from sales or otherwise, are fully authorized to pay taxes on all my lands, and all other necessary expenses, salaries, and costs of executing this will, or defending and protecting any of the property of which I may die seised." The twelfth clause bequeathed to Ewing's "friend and faithful bookkeeper, William Lytle, any and all claims that I may have against him at the time of my decease, and I relinquish all such claims, and direct my executors to deliver up to him all evidences thereof: provided, and on condition, that he remain and continue in the employment of my executors, in and about the business of the settlement of my estate, for a term of from one to two years, at a fair compensation." By the thirteenth item, "in view of the long and intimate relations existing between myself and my worthy friend Byrum D. Miner," the sum of $2,500 was bequeathed, and it provided that, because of "his long and intimate connection with my general business," Miner should be his active executor, and give his personal attention to settling up and protecting the estate. By the fourteenth clause, the sum of $10,000 was set apart "to be placed in the hands of my friend Byrum D. Miner, as trustee," for the purpose of "the support, maintenance, and education, during their minority, of William E. Miner and George E. Miner, two children of the said Byrum D. Miner." By the eighteenth clause, all the residue of the estate, not otherwise disposed of, was bequeathed to the three children of the testator, share and share alike, but not to be partitioned or otherwise disposed of by them until the executors should determine that it was not necessary for the purpose of improving the property mentioned in the fourth clause of the will.

On the 3d day of October, 1867, at 3 o'clock P. M., the quitclaim deed of

Ewing to Sweetser, of April 30, 1866, was filed for record in the office of the register of deeds for the county of Douglas, Wis., and on the same day, at 3:15 P. M., a quitclaim deed to Sweetser, executed and acknowledged by Miner and Ewing, as executors, December 8, 1866. This deed conveyed an undivided half of the land in question and some other, not included in the deed of April 30th, and its contents are sufficiently referred to hereafter.

December 8, 1866, a release from Madison Sweetser to the executors of George W. Ewing was executed, declaring the contracts ended, the executors and the heirs and legal representatives discharged from liability to Sweetser, or any one else, growing out of the business, and covenanting to hold the estate harmless. This release was witnessed by William Lytle and George W. Ewing, and bore a United States revenue stamp, canceled as follows: "S., 8–12, 1866."

December 11, 1866, Sweetser executed his note for $100, promising to pay B. D. Miner and William A. Ewing, or order, $100 one day after date, with interest. This note was sworn to by B. D. Miner, July 19, 1875, as a claim in favor of Miner and Ewing, as executors of George W. Ewing, and filed against the estate of Madison Sweetser, deceased, on that day.

December 11, 1866, the executors executed another quitclaim deed to Madison Sweetser, conveying the entirety of the lands embraced in the deed of December 8th, and reciting that it was given in full settlement of the partnership affairs, as hereinafter set forth. This deed was witnessed by William Lytle and D. B. Kentner, and acknowledged before Lytle, and was filed for record in Douglas county, Wis., October 3, 1867, at 3:30 P. M.

The deeds of December 8th and 11th, and the release, were in the hand-writing of Lytle. Upon the agreements of May 25, 1855, and August 12, 1857; the statement dated May 21, 1855; and the declaration of trust of July 28, 1860,—appeared the following indorsement in the handwriting of William Lytle, and signed by Sweetser, and by Miner as executor, all in red ink: "Canceled by deeds and agreements of December 8 and 11, 1866." This indorsement upon the duplicates of these papers in the possession of Ewing's estate bore also the signature of W. A. Ewing, executor, in black ink, and Ewing testified that he so signed some short time after the others. According to Mr. Holladay, a small carload of letters, papers, and books relating to Mr. Ewing's business in his lifetime was destroyed by Mr. Miner, two, three, or four years before he died, (which was in 1886,) with Holladay's knowledge and assent. The books kept by the executors contained an entry of the $100 note under date December 11, 1866, and, under the same date, of the payment on that day by Sweetser to the executors of the sum of $4,700, in extinguishment of mortgages. There was also an entry of payment, October 15, 1866, of a note of Sweetser for $583.50. The book of deeds kept by the executors, commencing in October, 1870, with deed No. 65, was produced, but the book prior to that, covering the period from June 4, 1866, to October, 1870, was not. No taxes upon the lands in controversy were paid by the executors after December 11, 1866, but they were paid by Sweetser, his heirs or grantees.

B. D. Miner had been in the employment of Mr. Ewing from 1838 to his death; acted as his executor until 1869, when he resigned, but continued in the employment of the estate until 1886, when he died. William Lytle entered the employment of Mr. Ewing in 1856, and continued therein, and in that of the executors, until his death, in about 1885. W. A. Ewing acted as executor until 1876, when, upon his resignation, Jesse Holladay was appointed.

George W. Ewing left surviving him three children: Mrs. Charlotte F. Ewing, the widow of her deceased cousin, then upwards of 30 years of age; Mrs. Lavinia H. Holladay, then about 26, and living in California with her husband, Jesse Holladay; and George W. Ewing, 2d, then about 25, who had married a daughter of Madison Sweetser, the defendant Mary C. Ewing. Charlotte F. Ewing married Mr. Thurston in November, 1866, and died in May, 1871, leaving two children, now known as Minnesota E. Tytus, born in 1865 or 1866, and Charlotte E. Webb, born in December, 1867. Mrs. Holladay continued to reside in San Francisco until 1875, when she came

to Chicago, where her husband joined her the next year. George W. Ewing, 2d, died in December, 1872, leaving his widow, Mary C. Ewing, and his son, George W. Ewing, 3d.

Madison Sweetser conveyed the lands embraced in the deed of December 11, 1866, to his daughter, Edith A. Sweetser, by deed bearing date May 24, 1869; and she conveyed to her mother, Caroline Sweetser, by deed bearing date May 26, 1869, both of the deeds being acknowledged before Lytle as notary public, and filed for record in Douglas county, May 10, 1875. Hyppolite Campbell conveyed to Sweetser the real estate in controversy April 3, 1869, the deed being recorded July 15, 1869.

Madison Sweetser died in 1876, and Caroline Sweetser, November 17, 1877; and her interest in the real estate descended to her daughters, Mrs. Clara E. Root, wife of Louis B. Root, Mrs. Mary C. Ewing, wife of George W. Ewing, 2d, then deceased, Fanny C. Sweetser, and Edith A. Sweetser. Edith A. Sweetser died May 28, 1881, and her interest descended to her three sisters. June 18, 1883, the heirs of Madison Sweetser gave an option to Hammond and Weeks for the purchase of the land in controversy, which was afterwards extended to July 20, 1883, the purchase price being $75,000. July 16, 1883, the Sweetser heirs conveyed their interest in these lands, by deed bearing that date, and containing a warranty against conveyances made by themselves, to Weeks and Hammond, which deed was recorded April 15, 1885, and on August 1, 1883, Weeks and Hammond conveyed to the Land & River Improvement Company, for whose benefit the purchase was made, which issued its stock therefor in the sum of $114,000, the excess over $75,000 going into the treasury. This deed was recorded April 17, 1875. The lands had been vacant and unoccupied until about this time, when they were inclosed by a wire fence by the company. Hammond called on Holladay for the quitclaim of Ewing's heirs in July, 1883.

In the summer of 1890 the heirs and legal representatives of George W. Ewing brought suit for partition of the real estate in question in the circuit court of Douglas county, Wis., to which all the parties to this suit were parties, and about 60 days later this bill was filed. On the hearing, the letters and documents hereinbefore referred to were adduced in evidence, together with the testimony of W. A. Ewing, Jesse Holladay, and others. Evidence was given as to the value of the lands in question in December, 1866; at the time the company purchased; and at the time the suit was commenced; as to when the defendants had actual information of the transaction of December, 1866; when complainant had actual notice of defendants' claim; and as to an attempt between the devisees and heirs to adjust that claim in 1884, etc. Various exceptions to the admission of evidence were taken.

The case came on for hearing on December 21, 1891, and a final decree was entered March 11, 1892. The circuit court held (Judge Bunn, presiding) that the complainant, and those under whom it claimed, had been since December 11, 1866, the equitable owner of the undivided one-half in controversy, and that the defendants, at the time of the filing of the bill, had and held the naked legal title thereto in trust for the complainant, and without any right to set up and enforce the same against the complainant; that the defendants should execute to the complainant a quitclaim and release of and for said lands, and all right, title, interest, claim, or demand of, in, or to the same, as heirs or devisees of George W. Ewing, deceased; that the complainant was the full, absolute, and complete legal and equitable owner of the lands, and that the claim of title by the defendants was illegal, inequitable, and void; and they were perpetually enjoined from setting up any claim of title whatever to the lands and premises, or any part thereof, against the complainant, and title and possession were quieted and confirmed in the complainant, its successors and assigns. An appeal was thereupon perfected to this court, and 37 errors assigned.

Bashford, O'Connor, Polleys & Aylward, (Frederic Ullmann, R. M. Bashford, and William F. Vilas, of counsel,) for appellants.

John C. Spooner and A. L. Sanborn, (S. U. Pinney, on the brief,) for appellee.

Before FULLER, Circuit Justice, and WOODS and JENKINS, Circuit Judges.

FULLER, Circuit Justice, after stating the facts, delivered the opinion of the court.

As by the terms of the agreements of May 25, 1855, and August 12, 1857, there was, in effect, community of interest in capital, profit and loss, and subject-matter, Ewing and Sweetser correctly referred to themselves as partners, and the executors to the "land partnership" between them. The enterprise was not limited to a particular adventure, nor merely to the purchase of land to be held for advance in value. Town sites, and interests in town sites, town lots, half-breed land scrip and other scrip, shares in land companies and associations, were to be acquired. If found advisable some of the property might be sold, and the proceeds divided, or reinvested for the joint account. The claims and purchases were referred to as joint capital or joint means. Each was to contribute equally to the expenses of the business. Joint land books, and regular accounts of expenses and costs, were to be kept. One-half of all the profits and gains, either in property or money, after all debts and advances were paid, belonged to each. Sweetser was to cause land scrip to be located, and to sell lands, but to consult with Ewing in large transactions, and so on. The defendants rightly admitted the existence of the partnership in their answer.

The question to be determined is not whether the legal title to the undivided one-half in controversy passed to Sweetser by the deed of December 11, 1866, but whether, through a settlement of the affairs of the partnership by and between Ewing's executors and Sweetser, the latter acquired such equitable right thereto as justified the decree of the circuit court. Unquestionably, this real estate belonged to the firm, and while the duration of the partnership was specified as five years from May 25, 1855, (including the extension,) purchases of many hundred acres were apparently made after that period expired, and the partnership affairs, confessedly, had not been closed up when Ewing died, May 29, 1866. The contention that by the execution of the declaration of trust of July 28, 1860, the lands therein embraced ceased to be partnership real estate does not commend itself to our judgment. Under the agreement of May 25, 1855, the party in whom the title was vested to be held for sale for joint and mutual benefit was to execute a declaration of trust on request. This particular declaration was not executed on any settlement of accounts and adjustment of equities between the partners, and lands were subsequently purchased; but, as far as it went, it furnished proper evidence that the lands named therein belonged to the enterprise, and not that the shares of an ascertained surplus were thereby transferred, and taken out of commerce.

Real estate purchased with partnership funds for partnership uses, though the title be taken in the name of one partner, is in equity treated as personal property, so far as is necessary to pay

the debts of the partnership, and to adjust the equities of the partners; and there may be cases of a partnership confined to dealing in real estate, where it might well be held that, being thus a commodity, it should be regarded as converted into personalty, out and out. Riddle v. Whitehill, 135 U. S. 621, 10 Sup. Ct. Rep. 924; Allen v. Withrow, 110 U. S. 119, 3 Sup. Ct. Rep. 517; Brown v. Slee, 103 U. S. 828. In any view, until the equities are adjusted and the surplus ascertained, the property is held subject to the same equitable rights and liens of the partners as if it were personalty, and the control of the surviving partner extends to the right to sell it, or so much of it as may be necessary to pay the partnership debts, or to satisfy all just claims of the surviving partners; and such sale vests the equitable ownership, so that the purchaser can, in a court of equity, compel the heirs and devisees of the deceased to convey their title. Shanks v. Klein, 104 U. S. 18. If he sells and conveys the same in good faith for a valuable consideration, without an order of court, he passes the equitable title to the purchaser. Walling v. Burgess, 122 Ind. 299, 22 N. E. Rep. 419, and 23 N. E. Rep. 1076. Of course, the power of an executor to convey his testator's real estate must be found in the provisions of the will, or in the order of the appropriate court, upon proper application, under statute. But the executor of a deceased partner, if not a member of the firm, may agree with the survivor that the share of the deceased may be ascertained in a particular way, or be taken at a certain value; and if the executor and the survivor, in good faith, come to an accounting respecting the partnership affairs, and settle the same as a final account, such settlement cannot be overhauled, except on the ground of fraud (or such unfairness as is equivalent thereto) or mistake. Colly. Partn. (6th Ed.) 382; Lindl. Partn. 1069; Sage v. Woodin, 66 N. Y. 578; Roys v. Vilas, 18 Wis. 174; Kimball v. Lincoln, 99 Ill. 578; Ludlow v. Cooper, 4 Ohio St. 1; Arnold v. Wainwright, 6 Minn. 358, (Gil. 241.)

The opinion in Valentine v. Wysor, 123 Ind. 47, 23 N. E. Rep. 1076, discusses the general subject, with much citation of authority. That was the case of a bill filed by the heirs of one Jack to set aside a conveyance by Jack's executors to Wysor, his surviving partner, in settlement of partnership affairs, and for an accounting, complainants offering to pay whatever might be found due. The conveyance was made in 1866, and the suit commenced in 1880. The court held that the power conferred by the will to settle, adjust, and compromise testator's debts, and to settle with his partners, and to sell and convey his real estate, included the power to settle at discretion, and to sell and convey according to the executors' best judgment; that a surviving partner has the right to the control and possession of the property of the firm, and may dispose of it in order to adjust the partnership accounts; that the rights of the heirs are subject to the adjustment of all claims between the partners, and attach only to the surplus which remains

v.57F.no.7—50

when the debts are paid, and the affairs wound up; that if the transaction was, for any reason, invalid, then the property would remain partnership property, unaffected by what had transpired; that the conveyance by the executors would not be disturbed by a court of equity unless impeached as fraudulent or unfair, or unless collusion were shown; that, a settlement and accounting between the executors and the surviving partner having been had, a court of equity would not, after a lapse of 14 years, unexplained by circumstances, decree the opening up of the account, although it appeared that the settlement had been irregularly made.

By the agreement of August 12, 1857, Ewing and Sweetser declare their intention and belief that, if either or both parties die before the business is finally closed up, their legal representatives should, will be able to, and can do so; and the correspondence shows that Miner was fully authorized by Ewing to conduct the negotiations pending from January, 1866, to Ewing's death, for a complete settlement and adjustment of the partnership affairs.

The will was executed February 17, 1866, and provided for the payment of testator's debts, the improvement and lease of certain real estate, and the distribution of rents, issues, and profits; and the executors were empowered to sell and convey, after appraisal, such of testator's lands in Ohio, Indiana, Illinois, Missouri, Minnesota, Wisconsin, and Kansas as should be necessary to carry out its objects and purposes; to make conveyances for such real estate as had been disposed of, and not conveyed; to receive rents and profits; and out of any moneys in their hands, arising from sale or otherwise, to pay taxes, expenses, salaries, and costs "of executing this will, or defending and protecting any of the property of which I may die seised." By the thirteenth clause "in view of the long and intimate relations existing between myself and my worthy friend Byrum D. Miner," the sum of $2,500 is bequeathed to Miner, and it is provided:

"And, in view of his long and intimate connection with my general business, it is my will and desire that he shall be my active executor, and give his personal attention to settling up and protecting my estate, and carrying out the provisions, meaning, and intention of this, my last will and testament; and in consideration thereof I will and direct that he shall receive forty-five hundred dollars ($4,500) per annum for the term of ten years, should he continue so long my executor."

Miner, accordingly, proceeded with the negotiation which had been commenced in Ewing's lifetime, and was in his charge at the time of the execution of Ewing's will, and of his death, and brought it to a conclusion in December, 1866.

April 30, 1866, Ewing had executed a conveyance to Sweetser of certain lands, which was left in Miner's hands for delivery upon compliance with certain terms and conditions. Sweetser had offered $100 for Ewing's interest, but it is not shown that he had agreed to the conditions prior to December, 1866. On the 8th of December, 1866, the executors made their deed to Sweetser, reciting that, by

the articles between Ewing and Sweetser, title to the lands named in the deed had been acquired; the execution by Ewing of the declaration of trust, and of the deed of April 30, 1866, conveying to Sweetser "all the lands acquired under said contracts, except the lands hereinafter described;" the death of Ewing, and probate of his will, and the power to make conveyances "of such real estate as the testator had disposed of, and not conveyed;" and thereupon, in consideration of the premises, the executors quitclaimed to Sweetser the undivided half of the land in controversy in section 14, 113.81 acres, and of 110 acres in section 24, in Douglas county, Wis., and of 320 acres in St. Louis and Lake counties, Minn., being 543.81 acres in all. By release bearing the same date, December 8, 1866, (the revenue stamp being canceled "8–12, 1866," variously interpreted as the 12th day of the 8th month, or the 8th day of the 12th month,) Sweetser recited the conveyance of April 30, 1866, as executed in settlement of the contract of May 25, 1855, and supplemental contracts, and that "in further settlement thereof" the executors "have this day conveyed to me certain lands in Douglas county, Wisconsin, and delivered to me all the personal property held by them acquired under said agreements;" and thereupon it was declared that the contract of May 25, 1855, and the "supplemental contracts," were wholly and finally ended, and the executors and the heirs and legal representatives of Ewing discharged from further liability to Sweetser "or any one else, growing out of the same," and Sweetser assumed "all the liabilities, of every name and nature, of the late partnership," and to "hold the estate of said Ewing free and entirely harmless from all suits, costs, and expenses in relation thereto." December 11, 1866, Sweetser executed his promissory note, payable to Miner and W. A. Ewing, for $100, the revenue stamp on which was canceled that day. This note was duly entered on the executor's account books on December 11th, and was subsequently proved up as a claim against Sweetser's estate. On the same day, Sweetser paid the executors, as appears from their books, $4,700 due Ewing as an individual loan or loans. On the same December 11th, the executors made their deed to Sweetser, reciting their conveyance of December 8th "by authority vested in them by the sixth clause of the said will;" that "on the 11th day of December, 1866, on a further settlement of the affairs of the late land partnership of said Ewing and Sweetser, growing out of their contract of 1855, and the supplements, in consideration that said Sweetser has taken upon himself to assume to pay any liability of the late partnership that may be unpaid, and released the said estate of and from all claims that he might have against said estate, as per an agreement and release dated December 8th, 1866,"—and proceeded: "Now, therefore, to make a full and final compromise and settlement of all said land operations, and the mutual matters of account growing out of the same, it was proposed by said executors that they would convey to said Sweetser the other undivided half of the lands embraced in said conveyance of December 8th, 1866, except the one hundred and

ten acres in the southwest quarter of section twenty-four, township forty-nine, range 14, in Douglas county, Wisconsin, which is to remain owned one-half by the estate of said George W. Ewing; and the other half by the said Sweetser, which proposition having been accepted by said Sweetser as a full and complete settlement of the matters of account, of one against the other, for all those land operations and expenses incident thereto, the delivery of this conveyance to be a complete bar to all actions at law or otherwise against each other in regard thereto: Now, therefore, in consideration of the premises," the executors quitclaimed to Sweetser the 320 acres in St. Louis and Lake counties, Minn., and the 113.81 acres in question in Douglas county, Wis., and it was then stated: "Thus by the conveyance of April 30; 1866, made by said Ewing, and by the conveyance of said executors of December 8, 1866, and by this conveyance, the representatives of said George W. Ewing are divested of all their title to all the lands acquired under those land operations, except their title in and to the undivided half of the one hundred and ten acres in the southwest quarter of section 24, town 49, range 14 east, in Douglas county, Wisconsin." Upon the contracts of May 25, 1855, and August 12, 1857, the statement of May 21, 1855, and the declaration of trust, appears the indorsement of cancellation "by deeds and agreements of December 8 and 11, 1866," signed by Sweetser and Miner, as executor, and subsequently, as he explains, by W. A. Ewing, as executor.

We concur with the circuit court that these papers are all to be taken together, and form parts of one and the same transaction. The money consideration of the deed of April 30, 1866, was $100, which was satisfied by the note of December 11th, and although the release bore date December 8th, we think that it and the deed of April were delivered with the instrument of December 11th, and on that day.

We conclude, therefore, that there existed a partnership between Ewing and Sweetser; that the land in question belonged to the estate in partnership, and was impressed with that character at the time of Ewing's death; and that the transaction in December, 1866, was in complete adjustment and settlement of all the partnership affairs, and all outstanding indebtedness, and of all claims and equities between the partners. The complainant took possession in 1884 under recorded documents evidencing its equitable ownership, and was not called on to vindicate its rights until, in 1890, the proceeding in partition was instituted. There was some evidence tending to show that there were debts; that Sweetser made claims on his own behalf; that partnership property had been sold or conveyed; that partnership property was in litigation; that there was personalty belonging to the firm, apart from real estate. But all those matters were included in what must be presumed, on the face of the papers, to have been a final settlement upon an accounting,—a settlement prima facie valid and binding, and presumptively properly made, and in the exercise of authority properly

exerted. So that the case is to be determined upon the contention of defendants that the settlement should be set aside for fraud or mistake, or such gross irregularity as vitiated its force and effect. Probably, it might have been wiser if the executors had invoked judicial interposition in affirmation of the settlement, but the settlement was not absolutely void because this was not done; and, regarded as voidable, merely, the general rules apply to an attempt to set it aside.

The averments of the answer (to be treated as equivalent to a cross bill) by which the settlement was sought to be impeached are, in brief, that there were no partnership debts; that Sweetser had no claim after the execution of the deed of December 8, 1866; that Sweetser falsely represented to the executors that there were claims against the partnership, that he had a valid claim, and that the real estate was of little or no value, whereby the executors were fraudulently induced to execute the deed of December 11, 1866. This bill was filed nearly 24 years after the transactions complained of, and these averments fall far short of the distinctness and precision required where fraud and mistake are charged after such lapse of time. Apart from this, we are to remember that Ewing, Sweetser, Miner, and the bookkeeper, Lytle, were all dead, and that the letters, papers, and books relating to the period prior to Mr. Ewing's death were destroyed, or not produced. Inasmuch as Miner had been in the employment of Ewing since 1838; was his confidential friend, and familiar with his affairs; was intrusted with the closing up of these very matters by Ewing, living, and especially charged by Ewing, in his will, to give his personal attention to settling up and protecting his estate,—while his diligence and faithfulness are nowhere impugned, the theory of ignorance on his part is wholly inadmissible, and we find no evidence upon which the position that he was deceived in the premises can be sustained. Both parties, in their correspondence, refer to debts of the concern, and, in one of his letters, Sweetser claimed a balance due to him. So far from undervaluing the lands, the evidence discloses that Sweetser insisted that they were valuable, and that the ill success of the business was attributable to want of expected money advances. Land had been sold. Property was in litigation. In his letter of March 26th, Ewing says that the list of January 30th was "full and complete, except as to that then and now in litigation." A suit with one Bratt, in New York, is particularly mentioned. Miner declares, in the letter of January 30th, the matter "complicated," and that he is determined "we will be rid of the annoyance and perplexity attending it." These and other things appear, but the grave has closed over those who could have stated and explained all the facts, and the record keeps the silence they might have broken. We have not been unmindful of the testimony of W. A. Ewing, Mr. Miner's coexecutor, but he was not at this time active in the management of the estate, and did not reside at its headquarters; and a careful examination of his

evidence, which we do not care to analyze, does not lead to any satisfactory conclusion at variance with the statements in the papers in whose execution he joined. The witness testified 25 years after the transaction, and under the disadvantage of having naturally left the dealings with Sweetser to Miner, who had been particularly charged with their adjustment. Something is said of heavy advances shown by a memorandum book made up by Lytle, under Col. Ewing's direction; of differences of opinion between Col. Ewing and Sweetser "about the expenditure of this money for lands which Col. Ewing thought were either worthless, or the title was not good;" of heavy losses in the Wabasha and Traverse de Sault matters; of Sweetser's claim that more money should have been advanced to protect and save these "vast interests;" of the witness' view that the deed of December 11, 1866, was not valid as a conveyance, was yielded to Sweetser's importunities, and filled with "Lytle's buncombe." But the fact remains, and is corroborated, that Miner was acquainted with the situation in all its details, and had been Ewing's confidential man of business for years, while there was no averment nor evidence against him of fraud or collusion in the premises. And this is also true of Lytle, in commendation of whom, as well as of Miner, the dead man spoke, through his testament, in such emphatic terms. What apprehensions, if any, were entertained in respect of the title to the half-breed lands named in the declaration of trust, which were conveyed to Ewing by Sweetser under power of attorney for the benefit of himself as well as Ewing; whether Col. Ewing's alleged advances were largely in other transactions, or were chiefly made in connection with the lands enumerated in the deed of April 30th; the nature and extent of the claims and counterclaims of the parties, and the reasons that prompted the adjustment arrived at, notwithstanding Sweetser's previous offers when negotiating with others for money advances,—are all matters with which Miner was manifestly thoroughly acquainted when the settlement was made, but which the record, substantially, leaves to conjecture. The memorandum book was not produced, nor were Sweetser's receipts for advances referred to in the agreement of August 12, 1857, nor was the executors' book of deeds prior to October, 1870, in which the conveyances in question were recorded for the information of all concerned. When Hammond applied for a quitclaim of the legal title held in trust for Sweetser's grantees in virtue of the settlement, Miner was still alive, and survived for several years thereafter; and the evidence of Holladay shows that the destruction of the old books and papers took place between 1882 and 1886, they being considered as of no value.

The instrument of December 11th declares that it was the executors who proposed to make the final compromise and settlement upon the basis of that conveyance, and that Sweetser accepted; and we are not constrained, by any adequate proof, to a result adverse to the adjustment so made, which could only be reached

at the expense of the reputations of those who participated, and were permitted to end their labors without assault, until they were no longer personally present to repel it. As heretofore stated, we are of opinion that the transaction of December was one transaction, and that the documents should be taken together, and regarded as delivered on December 11, 1866, in full settlement and adjustment. We cannot accede to the argument of counsel that the deed of April 30th, and the release and deed of December 8th, are to be treated as independent of the deed of December 11th. In his letter of January 30th, Miner wrote, if Sweetser made an acceptable proposition, "I shall require of you the surrender of the declaration of trust, and the canceling of the original agreements and amendments, and a release from all further claims against Col. Ewing on account of the same." But, as we have said, while Sweetser offered $100, it does not appear that he agreed to the conditions as stated, and the release executed covered, not only all liability to Sweetser, but to any one else, the assumption of all the liabilities of the partnership, and an agreement to hold the estate of Ewing "free and entirely harmless from all suits, costs, and expenses in relation thereto." To hold that a release thus comprehensive, the deed of December 8th, which was merely in compliance with the declaration of trust, and the deed of April 30, 1866, were delivered as a consummated, separate transaction prior to December 11th, would be irreconcilable with the giving of the note that day, the recitals of the latter deed, and the terms of the cancellation. Besides, the language of the release itself appears quite conclusive in this regard. It refers to the deed of April 30, 1866, as having been given in the settlement of the affairs of Ewing and Sweetser, and recites that "in further settlement thereof" the conveyance of an undivided half has been "this day" made, and all the personal property of the concern in the hands of the executors delivered; and as it does not refer to the deed of December 8th by its date, and that deed purported to be given under the power to convey real estate which had been disposed of, and not conveyed, and not in settlement, the inference is reasonable that the deed referred to is that of December 11th, intended to be executed December 8th, and, failing that, delivered contemporaneously with the release on the latter day. In the view we take of the case, it is not material whether the deed of December 8th was within the power or not, nor that the deed of April 30, 1866, took effect by relation; and, although the bill averred that the deed of December 8th was delivered on that day in settlement "in part," that averment does not, in itself, essentially affect our conclusion.

It is said in Hammond v. Hopkins, 143 U. S. 244-250, 12 Sup. Ct. Rep. 418:

"No rule of law is better settled than that a court of equity will not aid a party whose application is destitute of conscience, good faith, and reasonable diligence, but will discourage stale demands, for the peace of society.

by refusing to interfere where there have been gross laches in prosecuting rights, or where long acquiescence in the assertion of adverse rights has occurred. The rule is peculiarly applicable where the difficulty of doing entire justice arises through the death of the principal participants in the transactions complained of, or of the witness or witnesses, or by reason of the original transactions having become so obscure by time as to render the ascertainment of the exact facts impossible. Each case must necessarily be governed by its own circumstances, since, though the lapse of a few years may be sufficient to defeat the action in one case, a longer period may be held requisite in another, dependent upon the situation of the parties, the extent of their knowledge or means of information, great changes in values, the want of probable grounds for the imputation of intentional fraud, the destruction of specific testimony, the absence of any reasonable impediment or hindrance to the assertion of the alleged rights, and the like. Marsh v. Whitmore, 21 Wall. 178; Lansdale v. Smith, 106 U. S. 391, 1 Sup. Ct. Rep. 350; Norris v. Haggin, 136 U. S. 386, 10 Sup. Ct. Rep. 942; Mackall v. Casilear, 137 U. S. 556, 11 Sup. Ct. Rep. 178; Hanner v. Moulton, 138 U. S. 486, 11 Sup. Ct. Rep. 408."

We think that the circumstances disclosed here require the application of this salutary rule to the attack upon the settlement. That settlement was made between Sweetser and the active executor, Miner, both of whom are dead. The papers were in the handwriting of the bookkeeper, Lytle, and he is dead. The deeds of December 8th and 11th were witnessed by Lytle and Kentner, and Kentner is dead. The release was witnessed by Lytle and George W. Ewing, one of the heirs, and Ewing is dead. The books and papers which might have shed light upon the transaction were destroyed by Miner with the knowledge and consent of the then trustee, Holladay, before the bill was filed, though not until 16 to 19 years after the settlement. There was no adequate evidence of actual fraud, the instruments were duly recorded, the means of information were originally abundant, no concealment or suppression was shown, and the record demonstrates the utter inpracticability of restating an account between the partners. Evidence was given on both sides as to the value of the property in 1866, and thereafter, but it fails to convince us that at the time of the settlement the value of the half conveyed to Sweetser was so great as to raise any serious suspicion of fraud in that connection; and it is apparent therefrom that 17 years after, when the purchase was made by the company, the value had largely appreciated, while the enterprise upon which the company then embarked imparted an immense speculative increase.

By the settlement the property in question lost its partnership character, and became the separate property of Sweetser, and the principle of laches may justly be regarded as fatal to the maintenance of a suit to set aside that settlement, whether brought by the executors or the heirs and devisees; and, moreover, without resting the decision on that point, we hold that defendants failed to overcome the presumptions in favor of the settlement arising upon the documents.

The answer treated as a cross bill did not seek an accounting and adjustment of the partnership affairs, and discharge of the

partnership debts, if any, but a decree adjudging the legal title in them, free from any equities of complainant, and as if no settlement had ever been made, on the ground that the executors had no power to convey, and that the settlement should be avoided because of fraud, and the absence of a state of facts justifying the executors' action. In respect of the issue thus raised, whether by way of defense or of affirmative relief, the burden was upon the defendants. The circuit court was right, and its decree will be affirmed.

---

(October 4, 1893.)

WOODS, Circuit Judge, (dissenting.) The question in the case is of the validity and effect of the deed of December 11, 1866. I think it invalid, both for lack of consideration, and for want of authority in Ewing's executors to make it. That the deed was made without consideration is clearly enough proven, and is put beyond question by the bill and answer. In considering the evidence, it is not necessary to go beyond the statement made by the chief justice, which is full and fair.

The position of the appellants as defendants should not be confused with their position as cross complainants. As defendants, they are not chargeable with laches, and their claims, if not barred by statutory limitation,—of which there is no pretense,—should not be regarded with less favor on account of lapse of time, death of witnesses, destruction of papers, or other supposed loss or lack of evidence, for which they are not responsible. The appellee was not an innocent purchaser, nor the grantee of one. Its immediate grantors, who bought out the Sweetsers, made the purchase for the appellee, and, recognizing the defective character of the title obtained, sought to perfect it by means of a quitclaim from the appellants. They refused to convey, and if, from the time of that refusal, there was negligence in bringing a suit to determine the ownership, it is attributable to the appellee, rather than to the appellants, who—some of them being under legal disability—lived wide apart, and far from the land which is the subject of dispute. There is no apparent reason why the appellee should not have brought an early suit to establish its title, and its delay to do so until after Miner and Lytle, whose importance as witnesses was as plain then as now, had died, demonstrates either its own negligence, or a prudent purpose on its part to profit by postponing the issue. It is not probable, however, as we shall see, that, if living, Miner and Lytle could have put in a different light any essential point which the pleadings have left open to controversy. Neither is it probable that the books and papers of Ewing, which Holladay and Miner destroyed as "being of no value" would have been of value to either party, and especially to the appellee. That the litigation was likely to come, and would turn upon the deed of December 11th, Holladay and Miner well understood; and as one of them was interested to overthrow, and the other bound in honor to uphold, the deed, it is not to be presumed

that they joined, either purposely or carelessly, in the destruction of important evidence. It is in proof that the memorandum book to which reference has been made was prepared by Lytle for the purpose of showing Ewing's advances and expenditures in the joint transactions in land, and that the amount, as footed, exceeded $65,000. The loss of that book, therefore, did not harm the appellee. So, too, the nonproduction of "Sweetser's receipts for advances referred to in the agreement of August 12, 1857," is unimportant, because the amount of those advances is stated in that agreement; and, there being in the record undisputed copies of the deeds of December 8th and 11th, it is not easy to see what use there could have been for putting in evidence "the executor's book of deeds prior to October, 1870, in which," it is said, "the conveyances in question were recorded for the information of all concerned." There is no evidence that anybody was ever denied access to the book, or that it would not have been produced upon request.

There is, however, in the case, a notable omission of evidence, which the appellee ought to have supplied or explained. Sweetser was to be the active man in the business, and the contract of May 25, 1855, in terms, required him "to open and keep a set of joint land books, and to keep regular accounts showing all proper expenses and costs of making purchases, securing claims, etc., and to take necessary vouchers, etc." It is to be presumed that Sweetser complied with that requirement of the contract, and that his books showed at least his own receipts and expenditures, and that, if favorable to its contention, the appellee would have produced them, or offered some excuse for the failure.

But, passing by matters of conjecture and suspicion, and considering the case as the record presents it, we find no lack of convincing evidence upon the one essential point of inquiry. The contract between the parties shows the original expectation to have been that Ewing would advance the money necessary for the prosecution of the scheme; and it is as clear as could well be—in fact, Sweetser's letters imply, if they do not admit—that the advances which Ewing made far exceeded those of Sweetser, even if his salary for the entire time be included. And the great probability is that the one-half of his salary which was chargeable to Ewing did not remain unpaid. There is no claim to that effect in Sweetser's letters. The supplemental agreement of August 12, 1857, shows that at that time Ewing's advances had amounted to $8,000 or more,—a much larger amount of money than it was at first supposed would be needed,— and, there being no mention of anything due Sweetser, the fair inference is that nothing worthy of mention was then owing to him. It is little less certain that the money expended in the subsequent conduct of the business came from Ewing. Late in 1865, being anxious to have the business wound up, or off his hands, Ewing proposed to sell his share in the property for original cost and interest, and, by his letter of January 7th, Sweetser accepted the offer. This acceptance, though afterwards withdrawn, was equivalent to an admission that Ewing's interest in the property was worth what

it had cost. Of the entire correspondence which followed, it may be said, without quoting, that it shows that Ewing had made large advances without receiving anything in return; that he considered and Sweetser conceded his interest in the lands to be of substantial value; that Sweetser, for himself and another, by his letter of March 30th, offered to pay Ewing for his share his entire advancement, with interest, paying $5,000 in hand, etc., and on April 8th made a definite offer of $20,000 for all Ewing's interest in "Ewing and Sweetser affairs," paying down $4,000 or $5,000, and Ewing releasing a mortgage on his home, or himself to give up all papers, and release all interest, if placed in money and property where he commenced, with the loss of his labor for 12 years, claiming to "have borrowed some money, say $3,000, which had been expended in and about that business." Now, if to this sum of $3,000 Sweetser's salary from May 25, 1855. to May 25, 1866, be added, as if no part of it had been paid him, his entire expenditure in the joint business falls far short of the sum which he was offering to pay Ewing, that sum being far less than Ewing's expenditures are fairly shown to have been. It is therefore morally certain that, upon a just settlement of their accounts and dealings in land, there could have been found nothing due from Ewing to Sweetser, and that, for the conveyance made by the executors to Sweetser on December 11th for the Ewing half of the lands, there could have been no consideration, unless it was Sweetser's promise to pay the debts of the concern. But outside of the funds advanced by either party, which by the contract were to be refunded, with interest, as soon as the same could be realized from sales of any of the joint property, and were therefore debts of the concern, there were no considerable liabilities. The only unpaid debt, of which proof has been made, was for less than $40 due an agent on account of taxes which he had paid; and from the nature of the business, if there had been liabilities to third persons,—as, for instance, for lands bought on a credit, or for costs or attorney's fees incurred in litigation, or for taxes, or of whatever character,—the proof of them, and that Sweetser had paid them, if he had, would not have been difficult. Creditors, knowing Ewing's responsibility, would not have failed to present their demands, and demands presented Ewing would have paid. Besides, if the liabilities had been considerable, it was not business-like on the part of the executors to accept Sweetser's unsecured promise to discharge them.

The debts referred to in the correspondence between Ewing and Sweetser, for the payment of which it was said the lands should be sold, were, without doubt, for the advances made by Ewing. So Miner understood, when, on January 30th, he said of a proposed sale of part of the lands to Sweetser, "the proceeds will be used to refund to Col. Ewing  *  *  *  the large sum of money which he has furnished you from time to time for investment in that country." In short, Ewing, while in life, with the knowledge and assistance of Miner, whom he appointed one of his executors, was demanding, and Sweetser was conceding to be due, and was will-

ing to pay him, for his interest in their joint property, as much as $15,000; but a few months later, when nothing had happened to change the respective rights of the parties, except Ewing's death, Miner and his coexecutor, if their deed is to be upheld, gave to Sweetser for nothing the Ewing interest in all of the lands, except 110 acres, upon which no value has been set. That this was done, the living executor, Ewing, has testified, and the fact is otherwise sufficiently proven.

But, if the evidence left the question open to doubt, it is established by the undenied averments of the bill that the deed of December 11, 1866, was without consideration. It is alleged in the bill, not only "that the deed of December 8th was executed and delivered on that day," but that thereafter "on the 11th day of December, the deed bearing that date was executed;" and, without direct averment of the time when the release was executed, that paper is referred to in the bill as "Sweetser's agreement and release executed and dated December 8, 1866." Undenied, these averments must be taken as true, and given full effect. They make it impossible to concur with the circuit court in saying "that these papers are all to be taken together, and form parts of one and the same transaction." No matter what evidence to the contrary, the averments must prevail.

The contrary evidence, however, is not strong. The giving of the note for $100 was a small matter, and may have been overlooked on the 8th. The cancellation of the contracts and declaration of trust, after the execution of the deed and release of December 8th, was a useless matter of form, evidently not done before the 11th, but affording no proof of the time when other papers were delivered. The recitals of the second deed are that "on the 8th of December" the executors made the first deed, and that Sweetser "has taken upon himself, and assumed to pay," etc., "as per his agreement and release dated December 8, 1866." The release itself bears date December 8, 1866. The cancellation of the revenue stamp is of the same date. The conveyance of April 30th is recited as a past or completed transaction, (made so, doubtless, by delivery on that day,) and there follows the recital that "on further settlement" the executors "have this day conveyed to me certain lands" described; and then follow the declaration that the contract of May 25th and the supplemental agreement are ended, and Sweetser's agreement to discharge the executors and the Ewing estate and heirs, and to take upon himself all liabilities, in terms quite as comprehensive as the conditions and obligations which the second deed purports to impose upon him. It was proper, as the parties evidently assumed, that the deed of December 8th should be made under the sixth clause of the will, "in compliance with the declaration of trust;" and the execution of the release by Sweetser at the same time was manifestly just and right, because the liabilities he assumed, it is clear, were less than the amount due from him to Ewing for the excess of the latter's advancements over his own.

It being established, as it is both by the pleadings and the evidence, that the deed and release of December 8th were delivered as a consummated transaction separate from the conveyance of December 11th, there remained nothing further to be settled concerning the dealings in land; and it follows that the second deed was without consideration, and clothed the grantee with neither legal nor equitable interest.

Aside from, as well as because of, its lack of consideration, there was, in my opinion, a want of power in the executors to execute that deed. It is not to be questioned that, by their contracts, Ewing and Sweetser, in their land transactions, were partners, because the partnership is alleged both in the bill and the answer; and it is well settled that "real estate purchased with partnership funds for partnership uses, though the title be taken in the name of one partner, is, in equity, treated as personal property, so far as necessary to pay the debts of the partnership, and to adjust the equities of the partners." "But," as is added in Riddle v. Whitehill, 135 U. S. 621, 10 Sup. Ct. Rep. 924, whence the quotation is taken, "the principle of equitable conversion has no further application." And none of the cases cited go to the extent that the surviving partner, without the aid of a court of equity, can take possession of lands, of which both the title and possession were in his co-partner at the time of his death, and dispose of the same as personalty belonging to the firm.

It is not necessary here, however, to inquire into the powers of a surviving partner over partnership property, whether real or personal. Conceding his power to sell to third persons, he could not sell to himself, and if, by the deed in question, Sweetser acquired any interest, it was because of the power of the executors to make the grant. For their powers, we must look to the provisions of the will, as was done in Valentine v. Wysor, 123 Ind. 47, 23 N. E. Rep. 1076, or, if the will is silent, to such statutes as may be applicable. The provision in Ewing's will for the sale and disposition of personal property does not apply, and the direction given "to make sale of such of my real estate in the states of Ohio, Indiana, Illinois, Missouri, Minnesota, Wisconsin, and Kansas as shall be necessary to carry out and effect the objects and purposes of this will," and the further provision that no sale should be made without appraisement, it is manifest, do apply to these lands; and this conveyance, treated as a conveyance of land, was not only not authorized, it was forbidden, by the will.

"But," it is said, "the executor of a deceased partner, if not a member of the firm, may agree with the survivor that the share of the deceased may be ascertained in a particular way, or be taken at a certain value; and if the executor and the survivor, in good faith, come to an accounting respecting the partnership affairs, and settle the same as a final account, such settlement cannot be overhauled except on the ground of fraud (or such unfairness as is equivalent thereto) or mistake." Even by that rule, this settlement should not stand; but the doctrine stated rests on the com-

mon-law rule,—prevalent in some of the states, but not applicable to this case,—that the executor or administrator takes the title to the personal estate, and may deal with it substantially as the owner could when in life.

The law of Indiana since 1852, if not longer, has been different; and, if these lands are to be treated as personalty, it is the law of Indiana, where Ewing lived and died, that must govern. By that law the title of personalty, as well as of real estate, descends to the heir at law, unless otherwise directed by will; and as the executor or administrator has statutory authority to sell only at public auction, unless otherwise ordered by the court, it is held that a private sale, without order of court or testamentary authority, confers no title. Weyer v. Bank, 57 Ind. 198.

It may be conceded that the executors in this case had authority to make a settlement with Sweetser, and, if a balance was found due him, to pay it with money of the estate in their hands, of which it is shown they had an abundance; but, even if they were without money, they had no authority, without an order of court, to discharge the debt owing to Sweetser, or to other creditors, by transfer of property, whether personal or real, and especially not by a transfer of land, though capable, if there was necessity for it, of being treated as personalty, because it is the policy of the law, in Indiana, to protect the interests of the widow and heir at law in real estate, and to that end the personal estate of a decedent is made the primary fund for the payment of all debts, including mortgages and other liens upon real estate. Hunsucker v. Smith, 49 Ind. 114; Elliott v. Cale, 113 Ind. 383, 404, 14 N. E. Rep. 708, and cases cited. Indeed, the statute in force since 1852 requires the payment of "debts secured by liens upon the personal and real estate of the decedent, created or suffered by him in his lifetime," before the payment of general debts and legacies. Revision 1881, § 2378. It was therefore the duty of these executors, under the law, as well as by the requirements of the will, to pay Sweetser whatever was ascertained to be due him, out of moneys of the trust in their hands, and thereby preserve the land in question as real estate, and, if they had not ready money for that purpose, to obtain it out of the personal estate proper under the authority given them by the sixth clause of the will. They had no more right (unless given in the will, which is not pretended) to pay him by transferring Ewing's interest in the partnership lands than they would have had to pay him by transferring real estate which had never belonged to the partnership.

It is further to be observed that by an act of the Indiana legislature approved March 5, 1859, (Sess. Laws 1859, p. 134,) which remained in force until 1877, when it was amended, a surviving partner was required, within 60 days after the death of the co-partner, to make a full, true, and complete inventory of the estate, goods, chattels, rights, credits, and effects within his knowledge, and to cause the same to be appraised, and to file with the clerk of the court an affidavit that the schedule filed by the ap-

praisers contained a full and true statement of the partnership property. This statute was not complied with by Sweetser.

There is another reason why it was not competent, on the 11th day of December, 1866, to treat this land as personalty. If that right ever existed, it was extinguished by the transaction of December 8th. By the deed of that date, Sweetser accepted a conveyance of the undivided one-half of the land described, including that in suit, in discharge of the trust under which Ewing had held the title, thereby becoming tenant in common with the legatees of Ewing. By that act the partnership character of the land was lost, and if the account between the partners was not then or thereby settled, or if "Sweetser's agreement and release" of that date was not delivered till later, the account then became a personal one, into the adjustment of which the lands could not be drawn on the theory of being partnership assets. If the title and trust had been in Sweetser, instead of Ewing, and, in execution of the trust, he had conveyed the half interest to the Ewing legatees, he might thereafter, with equal propriety, have taken a conveyance from the executors in adjustment of the partnership accounts and liabilities.

Upon no view of the case can I think the appellee entitled to affirmative relief in equity. If, by lapse of time or otherwise, it had acquired a legal right against the appellants, or any of them, before the suit for partition was brought, it may be set up as a defense to that procedure.