INTERNATIONAL & G. N. RY. CO. v. CONCRETE INV. CO. (No. 5770.)

(Court of Civil Appeals of Texas. Austin. May 16, 1917. Rehearing Denied Nov. 7, 1917.)

1. REFERENCE ⬩99(1)—REPORT OF REFEREE—EFFECT AS ADJUDICATION.

The report of a referee, being equivalent to a special verdict by a jury, is a proper basis for a judgment, but is not evidence of an adjudication until it has been accepted and judgment rendered thereon.

2. REFERENCE ⬩48—AUTHORITY OF MASTER—ORDER OF APPOINTMENT.

The master in chancery has authority to adjudicate only that which has been referred to him by the order of his appointment.

3. RECEIVERS ⬩151—AUTHORITY OF RECEIVER—CLAIMS.

Under an order appointing a receiver for a railroad company and providing that he should hear proof as to the correctness and validity of debts and pass on liens and their priority and classify claims as to their liens and priority, the receiver had authority to determine the claim of an intervener which had accrued against the railroad company before he took charge of its property.

4. JUDGMENT ⬩739—RES ADJUDICATA—RECEIVERSHIP PROCEEDINGS.

Claims against a railroad company under Rev. St. 1911, art. 6625, enacted September 1, 1910 (Acts 31st Leg. [4th Called Sess.] c. 4), providing that the purchaser of any sold out railroad may form a corporation to take over the company's property and franchises, and that the property and franchises so purchased shall be charged with the payment of certain subsisting liabilities and claims, could not have been adjudicated in receivership proceedings had prior to the enactment of such statute, and therefore prior to the existence of the purchasing corporations.

5. JUDGMENT ⬩714(1) — RES ADJUDICATA — IDENTITY OF CLAIMS.

In order for a judgment to be res adjudicata, it must have litigated the same claim involved in the second suit, and not a different claim, though both may have grown out of the same transaction.

6. JUDGMENT ⬩719 — RES ADJUDICATA — PLEADINGS.

In passing on a plea of res adjudicata, the issues involved in the suits are determined from the pleadings therein.

7. JUDGMENT ⬩713(2) — RES ADJUDICATA — PLEADINGS—AMENDMENT.

That a claim under Rev. St. 1911, art. 6625, providing that the purchaser of any sold out railroad may form a corporation to take over the company's property and franchises, and that the property and franchises so purchased shall be charged with the payment of certain subsisting liabilities and claims, could have been asserted by amendment of a plea of intervention filed prior to the enactment of such statute did not make the determination of the plea res adjudicata as to such claim; it being essential, in order to sustain a plea of res adjudicata, that the issue shall have been presented by the pleadings, and not sufficient merely that it might have been so presented.

8. JUDGMENT ⬩735 — RES ADJUDICATA — IDENTITY OF ISSUES.

A judgment is not res adjudicata to a prior suit where the matter in issue in the subsequent suit was not in issue in the prior suit.

9. ELECTION OF REMEDIES ⬩7(3) — WHAT CONSTITUTES.

Where an intervener in receivership proceedings sets up, by amendment, in addition to a claim of priority under the doctrine of equity, a claim under Rev. St. 1911, art. 6625, providing that the purchaser of any sold out railroad may form a corporation to take over the company's property and franchises, and that the property and franchises so purchased shall be charged with the payment of certain subsisting liabilities and claims, the claims are cumulative and not inconsistent; and hence an intervener, by failing to so amend, was not estopped, on the ground that he had elected, between two distinct and inconsistent remedies, to set up in a subsequent suit his claim under the statute.

10. COURTS ⬩264(3)—JURISDICTION.

Where a federal court of competent jurisdiction has obtained possession of the res by the appointment of a receiver and has taken possession of all of the property of a railroad company, it has exclusive jurisdiction in all matters affecting the same during the pendency of the suit, with power to protect its decree against all other courts, and, to protect the purchaser of the property, may retain jurisdiction over same after it has been sold by the receiver and delivered to the purchaser.

11. COURTS ⬩489(1)—JURISDICTION—RECEIVERSHIP.

Where the only matters determined in a suit in federal court wherein a receiver was appointed for a railroad company were the validity and priority of claims under the principles of equity, a decree in such suit, providing that "all questions not hereby disposed of, including * * * the disposition of all claims heretofore filed herein or hereafter to be so filed, in

---

⬩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

accordance with the provision of this decree, are hereby reserved for future adjudication, and the court reserves jurisdiction of this cause and of the property affected by this decree, for the purpose of final disposition of all such matters, did not reserve jurisdiction so as to preclude a state court from determining a claim under Rev. St. art. 6625, against property purchased from the receiver.

12. RAILROADS ☞30 — PROPERTY — PURCHASING CORPORATION — "SUBSISTING LIABILITIES AND CLAIMS."

Debts represented by notes were not "subsisting liabilities and claims" within Rev. St. 1911, art. 6625, providing that the purchaser of any sold out railroad may form a corporation to take over the company's property and franchises, and that the property and franchises so purchased shall be charged with the payment of certain subsisting liabilities and claims, where debts and claims within such statute had been paid with money procured by giving the notes without any assignment of the claims or agreement that the lender should be subrogated to the rights of the creditors whose claims were paid with the borrowed money, particularly where the creditors were not parties to the transaction.

13. SUBROGATION ☞1—KINDS.

Subrogation is of two kinds, one by operation of law, the other by contract.

14. SUBROGATION ☞31 — INDORSEMENT OF VOUCHERS—ASSIGNMENT.

The indorsement of vouchers to a bank which advanced money to pay claims against a railroad company of the character mentioned in Rev. St. 1911, art. 6625, constituted an assignment of the vouchers to the bank, which, in consequence, became subrogated to the rights of the original holders.

15. RAILROADS ☞30 — SALE OF PROPERTY — SUFFICIENCY OF EVIDENCE.

Evidence, in a suit to enforce against railroad property purchased from a receiver a claim under Rev. St. 1911, art. 6625, providing that the purchaser of any sold out railroad may form a corporation to take over the company's property and franchises, and that the property and franchises so purchased shall be charged with the payment of certain subsisting liabilities and claims, *held* to show that the stockholders of the old company received stock in and control over the new company in consideration of their holdings in the old company.

Appeal from District Court, Travis County; George Calhoun, Judge.

Suit by the Concrete Investment Company against the International & Great Northern Railway Company. From judgment for plaintiff, defendant appeals. Affirmed.

S. W. Fisher, of Austin, and Wilson, Dabney & King, of Houston, for appellant. George L. Edwards, of St. Louis, Mo., and Lightfoot, Brady & Robertson, of Austin, for appellee.

### Findings of Fact.

JENKINS, J. (1) On February 27, 1908, and prior thereto, the International & Great Northern Railroad Company was incorporated under the laws of Texas, and owned and operated about 1,100 miles of railway through various counties of Texas, including Travis county.

(2) On said date, and prior thereto, the National Bank of Commerce of St. Louis was a banking corporation under the national banking laws of the United States.

(3) Prior to January 13, 1908, the International & Great Northern Railroad Company had applied to said bank for a loan of $150,000. On said date the bank granted the loan to said railroad company for $50,000, to be used in payment of operating expenses of said railroad, and said money was so used. The said railroad executed therefor its two promissory notes of $25,000 each, due six months after date, with interest from maturity at the rate of 8 per cent. Except the sum of $8,268.70, none of the money so loaned has been repaid.

(4) It had been the custom of said railroad company to issue to its employes vouchers for money expended in the operation of said road, payable at said bank, and when presented the bank paid the amount shown by the vouchers, the payee indorsing the same, and the bank would then send these vouchers to the treasurer of the company, who, if he found them correct, would draw a draft on the bank for the aggregate amount of such vouchers for each day.

(5) From February 22d to 26th, vouchers of the character mentioned were presented to said bank, and the amounts thereof were paid to the holders of such vouchers to the amount of $53,500. These vouchers were presented to the treasurer of the railroad company, who drew checks on various depositories in Texas of the railroad company, aggregating said amount of $53,500.

(6) At the time these checks were drawn the railroad company had a sufficient amount of money in said depositories to pay the same, but payment thereof was stopped by Thos. J. Freeman, who, on the 26th day of February, 1908, was appointed receiver of said road.

(7) On February 26, 1908, by virtue of certain judicial proceedings in the United States Circuit Court for the Northern District of Texas, wherein the Mercantile Trust Company, trustee, and others, holders of the bonds of said railroad company in cause No. 2501 in equity, were complainants, all of the railroad track, equipment, property, and franchises owned by said railroad company were taken from its possession and control and placed in the hands of Thos. J. Freeman, as receiver of said railroad company.

(8) Prior to the institution of said suit the said railroad company had executed its first, second, and third mortgage bonds, which were duly recorded.

(9) On May 10, 1910, a decree of foreclosure was entered in said cause No. 2501, wherein and whereby the second mortgage on said railroad was foreclosed, and all of said property was ordered to be sold to the highest bidder at public auction, in accordance with the terms, notices, and conditions provided in said decree.

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

(10) On November 27, 1908, pending said receivership proceedings, the National Bank of Commerce, appellee's assignor herein, by order of said court filed its two intervention claims, Nos. 1773 and 1774, alleging the indebtedness represented by said notes, and by the amount that it had paid on said vouchers, and claiming priority over said mortgages by reason of the alleged fact that the $50,000 had been borrowed for the purpose of paying the operating expenses of said road, and had been used therefor, and that the $53,500 paid on said vouchers were for the operating expenses of said road, and that the revenues of said road had been diverted to the payment of interest on the bonded indebtedness and for permanent improvements.

(11) On June 13, 1911, all of the property of said railroad company, including its franchises, were sold to Frank C. Nicodemus, who purchased same for himself and his associates.

(12) On August 10, 1911, said Nicodemus and his associates organized and incorporated under the laws of the state of Texas the International & Great Northern Railway Company, the appellant herein, for the purpose of acquiring, owning, maintaining and operating the said railroad and property theretofore belonging to the International & Great Northern Railroad Company.

(13) On September 16, 1911, Thos. J. Freeman, receiver as aforesaid, turned over to appellant all the property and franchises formerly belonging to said sold out railroad company, and appellant is still in possession and control of said property, and is operating said railroad.

(14) On September 25, 1911, the master commissioner, who made said sale, duly reported the same to the honorable United States Circuit Court for the Northern District of Texas, which on said date in all things approved said sale, and fully and finally discharged the receiver.

(15) On January 16, 1912, the appellant herein filed its petition of intervention in said cause No. 2501, setting forth the facts as to the sale of said railroad property, and its incorporation, and alleging that it was the owner and in possession of all of said property and franchises, subject to the reservation and conditions in the decree of foreclosure; that there were pending under said decree various claims against said property, and that the petitioner desired to contest such of said claims as were unjust or excessive, and praying that it be allowed to become a party to said cause, which petition on said date was granted.

(16) On the ——— day of ———, 1912, the master in chancery, to whom said plea of intervention had been referred, filed his report therein, in which he found in favor of the intervener as to the amount of the indebtedness, but against the intervener as to the priority of its claim, finding that there had been no diversion of funds, and that the claims were not entitled to priority. No exception was filed to this report.

(17) On the ——— day of December, 1912, the National Bank of Commerce of St. Louis, being then the owner and holder thereof for a valuable consideration, transferred said notes and its claim thereon, and its claim for the money paid out on said vouchers, to the appellee herein.

### Opinion.

Appellant has filed 51 assignments of error. We shall not attempt to discuss them seriatim, as the matters involved can be grouped under comparatively few points.

It is the contention of appellant that the matters here involved were finally adjudicated by the federal court in the proceeding referred to in our findings of fact, and, if not, that they are still pending in that court, by reason of its having retained jurisdiction thereof in its final decree.

First. As to res adjudicata. Was there any judgment of the federal court on the issues raised by the bank's pleas of intervention? A master in chancery was appointed; he investigated the bank's pleas of intervention, and reported thereon favorably as to the amount claimed to be owing the bank by the International & Great Northern Railroad Company, but adversely as to its claim of priority over the mortgage indebtedness. This report concludes as follows:

"I conclude that the claim of intervener is a common claim, and I *recommend* (italics ours) its allowance in class 5 in accordance with the master's recommendation as to a general classification. All of which I respectfully submit.
    "W. H. Flippen, Mastery in Chancery."

[1] It was agreed that no exceptions were filed to this report. Appellee asserts in its brief that no judgment was entered on this report. Appellant, though it filed a supplemental brief herein, has not denied this statement, but assumes that this report became a judgment because it was not excepted to. We have been cited to no authority to sustain this contention, and we know of none. A report of a referee (which the master in chancery was) is equivalent to a special verdict by a jury, and is a proper basis for a judgment (23 Cyc. 776, 784), but it is not evidence of an adjudication until it has been accepted and judgment rendered thereon. 23 Cyc. 1123. The report is not a judgment. 34 Cyc. 849.

[2, 3] If the report of the master in chancery be treated as a judgment, what did it adjudicate? He had no authority to adjudicate anything, except what was referred to him by the order of his appointment. 16 Cyc. 441. The only portion of said order which could possibly be construed as embracing the matter here in controversy is the following:

"He is hereby authorized, directed and empowered to investigate, hear proofs and report on all claims made and filed by said claimants

as will be hereinafter provided, and which may have accrued against the said International & Great Northern Railroad Company prior to the time the receiver herein took charge of the property of said International & Great Northern Railroad Company. * * * It is further ordered and directed that said master in chancery shall not only hear proof as to the correctness and validity of said debts, but also upon the question and issues as to liens and their priority, if any, and he shall report as to the amount of such claims, and whether the same are valid and due and owing by the said International & Great Northern Railroad Company, and the amount thereof, and shall classify such claims as to their liens and priority, in the event any of same have any priority or preference."

The claim of the intervener, the bank, "accrued against the said International & Great Northern Railroad Company prior to the time the receiver herein took charge of the property of the said International & Great Northern Railroad Company," and so was embraced in the order appointing the receiver. The pleadings of the intervener raised the issue as to what, if anything, was due it by the International & Great Northern Railroad Company. Upon this issue the master in chancery found in favor of the intervener, and in the instant case no issue is raised as to the amount found by the master in chancery, the same being the amount here sued for. The pleadings raised the further issue as to whether or not, under the facts and the law as it existed at the time said plea of intervention was filed, by reason of a diversion of said funds advanced by the intervener, it had a prior lien on the property of said railroad company. If the appellee is asserting such prior lien in the instant case, assuming that the master's report amounts to a judgment, the plea of res adjudicata ought to be sustained.

[4] But it is the contention of appellee that it is not here asserting any lien on the property of the International & Great Northern Railroad Company, but that it is asserting a debt against the International & Great Northern Railway Company, the appellant herein, under and by virtue of the act of the Texas Legislature of September 1, 1910, which is carried forward in the Revised Statutes as article 6625. Said article provides that the purchaser of any sold out railroad may form a corporation to take over the property and franchises of the sold out company; "provided, that, notwithstanding such incorporation, the property and franchises so purchased shall be charged with and subject to the payment of all subsisting liabilities and claims for death, and personal injuries sustained in the operation of the railroad by the sold out company * * * and for the current expenses of such operation, including labor, supplies and repairs; provided, that all such subsisting liabilities shall have accrued within two years prior to the beginning of the receivership resulting in the sale of such property and franchises."

Was the liability of the appellee for the

claims herein sued on adjudicated in the receivership proceedings in the federal court? We think not, for the reason that appellee's assignor, the St. Louis bank, did not allege any such liability in its plea of intervention. It could not have done so for the reasons that, the statute referred to not having then been passed, and the appellant not being then in existence, no such liability against it could have then existed.

That the complainant in the federal court believed that said statute created a liability against the purchaser of the railroad about to be sold, which did not theretofore exist, is evidenced by its petition to postpone the sale of said road, filed herein on September 7, 1910; said sale having been advertised to be made on September 15, 1910. Said petition set out substantially the decree of sale, and recited that the owners of the third mortgage bonds had arranged for their protection to buy said railroad properties at said sale, but that said act of September 1, 1910, if valid, would increase the liabilities of the purchasers, over and above those provided for in the decree of sale in an amount of approximately $2,250,000. In said petition it was alleged that the liabilities as to unpaid indebtedness which the court had or might decree as superior to the mortgage indebtedness "were those and those only which, under the rules of equity established by decisions of the courts of the United States, are entitled to priority or preference in payment in similar cases, and that such liabilities did not, and were not intended to, include claims or liabilities of the character and description mentioned and set forth in said act of the Legislature of Texas approved September 1, 1910, above mentioned." We think that this was a correct construction of this act. It is probable that the court was of the same opinion, as it postponed said sale. Said sale was not made until June 13, 1911.

[5] In order for a judgment to be res adjudicata, it must have litigated the same claim involved in the second suit, and not a different claim, though both may have grown out of the same transaction. Horton v. Hamilton, 20 Tex. 606; Mortgage Co. v. Macdonell, 93 Tex. 405, 55 S. W. 737; Houston v. Walsh, 27 Tex. Civ. App. 121, 66 S. W. 109; Evans v. Borchard, 8 Tex. Civ. App. 276, 28 S. W. 259, 260; Manning v. Green, 121 S. W. 725; Kerr v. Blair, 55 Tex. Civ. App. 349, 118 S. W. 793; Norton v. Wochler, 31 Tex. Civ. App. 522, 72 S. W. 1026; Noel v. Clark, 25 Tex. Civ. App. 136, 60 S. W. 360; Walsh v. Ford, 27 Tex. Civ. App. 573, 66 S. W. 857.

[6] The issues involved in a suit are determined from the pleadings. Freeman v. McAninch, 87 Tex. 135, 27 S. W. 97, 47 Am. St. Rep. 79; Bradford v. Knowles, 78 Tex. 116, 14 S. W. 307.

The pleadings of the intervener in cause No. 2501 in the federal court show that it was asserting a priority against the property

of the International & Great Northern Railroad Company, by reason of its indebtedness incurred under certain alleged facts. The pleadings in the instant case show that it is claiming a prior lien against the property of International & Great Northern Railway Company, a different corporation, by reason, not only of the indebtedness of the International & Great Northern Railroad Company, which is not disputed, but also by reason of the fact that the new corporation, the appellant herein, by virtue of its articles of incorporation, agreed that its property which it purchased from the sold out company should be liable for such debt. In obtaining its charter, and taking over the property of the sold out railroad, the appellant agreed that such property should be liable for the debts of the International & Great Northern Railroad Company, of the character mentioned in article 6625, Revised Statutes, without regard to whether or not such indebtedness constituted a lien against the property of the sold out company. Appellee alleged in its petition herein that the claims here sued on were of that character.

[7] Appellant contends that the action of the federal court in reference to the bank's plea of intervention should be held to be res adjudicata as to the matter involved in this suit, for the reason that, although the intervener's claim here asserted by its assignor, the appellee herein, could not have been asserted when said plea of intervention was filed, it could have been asserted by amendment after the passage of the act of September 1, 1910, which was prior to the report of the master in chancery, and prior to the sale of the International & Great Northern Railroad. It is not sufficient to sustain a plea of res adjudicata that an issue might have been presented by the pleadings, but it must also appear that it was so presented. Norton v. Wochler, 31 Tex. Civ. App. 522, 72 S. W. 1026; Cromwell v. Sac Co., 94 U. S. 351, 24 L. Ed. 195.

[8] It is also a well-established principle of law that a judgment will not be held to be res adjudicata to a subsequent suit where it affirmatively appears that the matter in issue in the subsequent suit was not in issue in the prior suit. James v. James, 81 Tex. 380, 16 S. W. 1087; Teal v. Terrell, 48 Tex. 491; Converse v. Davis, 90 Tex. 466, 39 S. W. 277; Groesbeck v. Crow, 91 Tex. 77, 40 S. W. 1028; Linberg v. Finks, 7 Tex. Civ. App. 391, 25 S. W. 791; Williams v. Wiley, 96 Tex. 152, 71 S. W. 12.

We think the pleadings of intervener in cause No. 2501, as well as the judgment therein, if the report of the master in chancery be treated as a judgment, show that the issue here involved was not adjudicated in the federal court. For the reasons stated, we overrule appellant's assignments as to res adjudicata.

[9] We do not think that there is any merit in appellant's assignment to the effect that appellee is estopped by the proceedings in the federal court upon the doctrine of election of remedies. This doctrine rests upon the ground that where a party has two distinct and inconsistent remedies, by electing to prosecute one of them he thereby abandons the other. Bandy v. Cates, 44 Tex. Civ. App. 38, 97 S. W. 711.

Had the intervener in cause No. 2501, in addition to his alleged claim of priority under the doctrine of equity, set up by amendment the right here asserted of subjecting the property purchased by appellant to appellee's claims by virtue of the act of 1910, the claims would not have been inconsistent, but cumulative.

[10] The next issue which we will consider is whether the district court of Travis county was without jurisdiction to try this cause by reason of reservations made by the federal court in its final decree herein. A court of competent jurisdiction having obtained possession of the res, as did the federal court in cause No. 2501 by the appointment of a receiver, who took possession of all of the property of the International & Great Northern Railroad Company, has exclusive jurisdiction in all matters affecting the same during the pendency of such suit, with power to protect its decree against all other courts, and may, for the purpose of protecting the purchaser of such property, retain jurisdiction over the same after it has been sold by the receiver and delivered to the purchaser. Railroad Co. v. Adelbert College, 208 U. S. 38, 28 Sup. Ct. 182, 52 L. Ed. 386; Julian v. Trust Co., 193 U. S. 93, 24 Sup. Ct. 399, 48 L. Ed. 629; Ex parte Chetwood, 165 U. S. 445, 17 Sup. Ct. 385, 41 L. Ed. 788.

[11] When the federal court entered its final decree discharging the receiver, and turned the property over to the purchaser, it lost control of the res, and all matters pertaining thereto, except in so far as it rightfully retained jurisdiction for the purpose of protecting such purchaser. In Julian v. Trust Co., supra, where the final decree of the court expressly reserved the right to retake possession of the property and to resell the same under certain contingencies, it was held that another court was without jurisdiction to enter a judgment which in effect nullified the judgment of the court in which the receivership had been pending, by holding that the sale made under the order of said court was null and void, in that the purchaser, not being a domestic corporation, had no right to become such purchaser.

In the Adelbert College Case, supra, the federal court, in confirming the decree of sale, likewise reserved the right to retake and resell the property if necessary to protect the right of parties, which the court might thereafter adjudge to be superior to the mortgage lien. In the instant case the final decree purported to invest the purchas-

er with full title to all of the property of the sold out road, subject, among other things not material to the issues in this suit—

"to any unpaid indebtedness or liability contracted or incurred by said defendant railroad company in the operation of its railroad, which the court may hereafter order or decree herein to be prior to or superior to the lien of said mortgage [the second mortgage]. * * * That all questions not hereby disposed of, including * * * the disposition of all claims heretofore filed herein, or hereafter to be so filed, in accordance with the provision of this decree, are hereby reserved for future adjudication; and the court reserves jurisdiction of this cause and of the property affected by this decree, for the purpose of final disposition of all such matters."

What matters? Evidently claims asserted to be superior to the mortgage indebtedness, which had been filed, but not adjudicated, or which might thereafter be filed. If the bank's claim of superiority of its indebtedness had theretofore been adjudicated, as claimed by appellant herein, it was not included in said reservation. If it had not been adjudicated, the federal court retained jurisdiction to adjudicate the same. But, as we have heretofore stated, the claim here asserted is not that its claim against the sold out company is, under the principles of equity, superior to the mortgage indebtedness, but that in obtaining a charter from the state of Texas, appellant assumed such indebtedness, and agreed that property which it purchased at said sale should be held by it subject to the same, if of the character mentioned in said article 6625, without reference to whether or not it was superior to the mortgage indebtedness. Such being the case, if the appellee should now apply to the federal court to adjudicate, under its reserved power above referred to, whether or not its claim filed in its assignor's plea of intervention was superior to the mortgage indebtedness, and that court should decree that it was not, such decree would be immaterial to the issue here involved, viz. the liability of appellant under its charter contract.

For the reasons stated, we overrule appellant's assignments attacking the jurisdiction of the district court of Travis county.

Having disposed of the questions of res adjudicata and jurisdiction of the trial court, the next issue in logical sequence is:

"Are the debts and claims herein asserted of the character mentioned in article 6625, Revised Statutes?"

One of these debts is that evidenced by the two promissory notes mentioned in our findings of fact herein. This case was submitted to a jury upon special issues, among which were the following:

Question No. 1: "At the time of the execution of the two notes sued upon in this case, and described in plaintiff's petition, was there any understanding or agreement existing between the International & Great Northern Railroad Company and the National Bank of Commerce in St. Louis, that the proceeds of said notes should be used by said railroad company in the pay-

ment of its current expenses of operation, including labor, taxes, supplies, and repairs?" To which the jury answered: "Yes."

Question No. 2: "Did the International & Great Northern Railroad Company use the proceeds of said notes for the payment of the current expenses of operation, including labor, taxes, supplies, and repairs?" To which the jury answered: "Yes."

We think that the evidence is sufficient to sustain these findings, and we therefore find the facts to be as indicated by said questions and answers.

[12] But, notwithstanding these facts, we are of the opinion that the debt evidenced by these notes is not of the character mentioned in article 6625, viz. "subsisting liabilities and claims" of a certain character. The debts and claims paid with the money borrowed were of this character, but, having been paid by the railroad company, they no longer subsist, and if the property of the sold out company is liable therefor in the hands of appellant, it is so upon the doctrine of subrogation. Had these claims been assigned to the bank, it would have been subrogated to the rights of the original holders thereof. There was certainly no express assignment. Had there been an agreement between the railroad company and the bank that the bank should be subrogated to the rights of the creditors whose debts were to be paid with the borrowed money, the bank's assignor, the appellee herein, might enforce such agreement under the doctrine of subrogation. There was no such agreement, unless the mere fact that the money was borrowed because it was needed to pay operating expenses, and that this fact was made known to the bank, amounts to an implied agreement that the bank should be subrogated to the right of such creditors. We do not think that it does. In Bank v. Railway Co., 36 S. W. 134, the court said:

"If A. should borrow from B. a sum of money which A. uses to discharge a lien held by another or appropriates it to the payment of a debt due and owing by such other, or if A. should purchase property with the money borrowed, in neither case would B., the lender, in the absence of a contract or agreement between the parties, have any lien or interest in the debts or lien discharged or in the property purchased."

We think that this is a correct statement of the law. Bank v. Bank, 80 Ark. 197, 96 S. W. 749, 117 Am. St. Rep. 85, 10 Ann. Cas. 211; Trust Co. v. Bridges, 57 Fed. 774, 6 C. C. A. 539; Re Construction Co., 38 N. J. Eq. 433; McDonald v. Railway Co., 93 Tenn. 281, 24 S. W. 253; Morgan v. Railway Co., 137 U. S. 171, 11 Sup. Ct. 61, 34 L. Ed. 625.

[13] Subrogation is of two kinds: One by operation of law, as where a party is compelled to pay off a prior incumbrance in order to protect himself; the other arises by contract, as where a debt secured by a lien is assigned to him, or where he furnished the money with which such debt is paid, with the agreement on the part of the debtor

that he shall have the benefit of the security of the debt so paid.

Where the creditor is not a party to the transaction there can be no assignment of his debt. Railroad Co. v. McCaughey, 62 Tex. 271. In the instant case, those who held the claims for operating expenses against the International & Great Northern Railroad Company knew nothing of the transaction between the bank and the company. They only knew that their debts were paid by the railroad company; they are not shown to have known where the railroad company got the money.

Appellee cites the case of McIlhenny v. Binz, 80 Tex. 1, 13 S. W. 655, 26 Am. St. Rep. 705. In that case the laborers who had the prior lien were parties to the contract. The court said:

"The claims so accruing in the hands of the boarding house keepers, and in the hands of the grocers, were properly treated as claims originally due laborers, etc., and duly assigned to the holders."

There are numerous cases in this state in which it has been held that a party loaning money to pay off a debt secured by a lien will be subrogated to the rights of the lienor whose debt has been paid, but in every such case, so far as we have been able to find, there was a contract in which the debtor who borrowed the money agreed at the time of the loan that the lien held by the creditor should inure to the benefit of the lender. Thus subrogation was created by contract. Pridgen v. Warn, 79 Tex. 593, 595, 15 S. W. 559; Hicks v. Morris, 57 Tex. 658; Ellis v. Singletary, 45 Tex. 27; Clark v. Burke, 39 S. W. 308; Ford v. Ford, 22 Tex. Civ. App. 453, 54 S. W. 773; Warhmund v. Merritt, 60 Tex. 24; Dillon v. Kaufman, 58 Tex. 696; Eyler v. Eyler, 60 Tex. 315; Savings Bank v. Paschall, 12 Tex. Civ. App. 613, 34 S. W. 1001; Park v. Kribs, 24 Tex. Civ. App. 650, 60 S. W. 911; Loan Ass'n v. Everheart, 18 Tex. Civ. App. 192, 44 S. W. 888; Downard v. Loan Ass'n, 22 Tex. Civ. App. 570, 55 S. W. 981.

[14] The trial court submitted the following questions as to the vouchers:

"Question No. 5: Was the payment by the National Bank of Commerce to the holders of pay checks and vouchers which are claimed by the plaintiff to have been drawn by the auditor of said railroad company upon its treasurer in favor of its employés for labor and in favor of those furnishing it supplies for supplies, and made payable at said bank, intended as a payment by said bank to the holders of said pay checks and vouchers on behalf of said railroad company of the indebtedness so owing by said railroad company for labor and supplies, thereby discharging said railroad company from further liability on account of such indebtedness?" To which the jury answered: "No."

"Question No. 6: Was the payment by the National Bank of Commerce of said pay checks and vouchers referred to in question No. 5 intended merely as a purchase by said bank of said pay checks and vouchers for the convenience of said railroad company, which were in turn to be paid by said railroad company to said bank from day to day?" To which the jury answered: "Yes."

The issues submitted to the jury in said questions were proper for their determination. Wood v. Trust Co., 128 U. S. 416, 9 Sup. Ct. 131, 32 L. Ed. 474. We think the evidence is sufficient to sustain the findings of the jury. Such being the case, the indorsement of the vouchers to the bank amounted to an assignment of the same. 37 Cyc. 380. The claims evidenced by the vouchers were of the character mentioned in article 6625, R. S., and the bank, as assignee of the same, was subrogated to the rights of the original holders thereof. Moore v. Raymond, 15 Tex. 555; Murray v. Able, 19 Tex. 213, 70 Am. Dec. 330; McAlpin v. Burnett, 19 Tex. 500; White v. Downs, 40 Tex. 232; Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675, 28 L. Ed. 598; Dudley v. Railway Co., 65 Mich. 655, 32 N. W. 887.

[15] The court also submitted the following question to the jury:

"Question No. 3: Did the stockholders of the International & Great Northern Railroad Company (the old company) receive any benefits through the plan or method under which the properties of the old company were acquired by the International & Great Northern Railway Company (the new company, and which new company was organized to acquire the properties of the old company)? By benefits are meant such as stock in or control over the new company in consideration of their holdings in the old company."

"To aid the jury in answering question No. 3, they are instructed that if they find from the evidence that new securities were to be delivered to the stockholders of the International & Great Northern Railway Company on account of money advanced by them and on account of being a third mortgage holder, or either, and not on account of being stockholders of the International & Great Northern Railroad Company, then in said event the jury will answer question No. 3 in the negative."

To this question the jury answered: "Yes."

Appellee assigns error as to this answer for the reason that there was no evidence to sustain it. This case is in one aspect similar to the case of Railway Co. v. Boyd, 228 U. S. 482, 33 Sup. Ct. 554, 57 L. Ed. 931, in that it was in effect a suit by the Goulds against themselves. They owned a majority of the stock of the third mortgage bonds. These bondholders were the original plaintiffs. They owned practically all of the International & Great Northern Railroad Company, the original defendant. Afterwards the owners of the second mortgage bonds brought suit to foreclose their lien, and the causes were consolidated. The railroad company accepted service in both suits. A consent decree was entered May 10, 1910, at which time the owners of the third mortgage bonds had acquired the second mortgage bonds. The property of the International & Great Northern Railroad Company was sold to Frank C. Nicodemus, who acted in behalf of the third mortgage bondholders. A new corporation was formed, to which all of the property of the old corporation was de-

livered, subject to the lien of the first mortgage bondholders, and certain other debts amounting in the aggregate to $13,520,-463. The Goulds own the new corporation. The claims of the second and third mortgage / bonds amounting to $16,805,647.88 were provided for by new securities and cash; aggregate liabilities $30,326,110.88. The property bought was valued by the Railroad Commission at $30,365,047.97. This, together with $5,000,000 in cash contributed by the Goulds, aggregating $35,365,047.97, was its capital stock. From this deduct its liabilities $30,326,110.88, and it leaves $5,038,-937.09, against which it could issue stock. It issued $4,822,000 of stock, leaving $316,-937.09, which was absorbed in the expenses of reorganization. Of the stock issued, $3,-400,000 was preferred stock now owned by the Goulds, and $1,422,000 was delivered to a Virginia corporation, which is also virtually owned and controlled by the Goulds by virtue of their ownership of the majority of the stock of that company. All this seems very simple, but we have been able to ascertain these facts, as well as the interest of the Goulds in the new company as hereinafter stated, only by examining several hundred pages of the statement of facts, and the voluminous briefs and supplemental briefs of appellant and appellee, dealing with the evidence as to the reorganization, which, if not intended to confuse, is well calculated to do so. From the evidence it appears that the transaction of buying the property of the old company was carried on through the medium of committees, trustees, and syndicates, with written proposals, acceptances, and agreements, in such profusion as are well calculated to be confusing.

It appears that it was originally contemplated that the Goulds, under the name of the syndicate, should have bonds and stocks aggregating $7,500,000, but, by reason of the property being valued at less than was contemplated, this could not be done. To obviate this difficulty, and apparently to evade the Texas stock and bond law, there was organized under the laws of Virginia a holding company. To this company there was delivered $1,422,000 of the common stock of the International & Great Northern Railway Company (the new company), and $5,078,000 of what are denominated "interim certificates" of the International & Great Northern Railway Company, total, $6,500,000. These interim certificates were issued by the International & Great Northern Railway Company, and entitled the holder to a like amount of the common stock of said company, as and whenever the same can be issued, and are in effect a contract of sale of such stock as and when, by reason of the future increase in the value of the property of said company, the same can be issued. In payment of said stock and interim certificates the Virginia corporation issued its stock. Notwithstanding all that has been stated, the Goulds, who are the owners of the new company, are entitled to all of its stock that they paid for.

The real issue now under consideration is, Did the Goulds, who owned the old railroad, and who own the new railroad, get anything of value in the reorganization which they did not pay for? If so, it must be presumed that they got the same by reason of their control of both corporations. The Virginia company issued its stock ($6,500,000) to the Goulds, $2,500,000, and the remainder, $4,000,000, pro rata to the owners of the third mortgage bonds, of which the Goulds owned 63.8 per cent. Thus they received of the Virginia corporation's stock $2,552,000 in addition to the $2,500,000 above mentioned, or a total of $5,052,000. In addition to this, they received refunding bonds, $1,600,000, preferred stock $3,400,000, total, $5,000,000. So it appears that for the $5,000,000 cash paid by the Goulds they received:

| | |
|---|---|
| Refunding bonds and preferred stock ......................... | $5,000,000.00 |
| Stock in the Virginia Corporation ......................... | 5,052,000.00 |
| Total ................... | $10,052,000.00 |

In view of these facts, we cannot say that there was no evidence to sustain the finding of the jury to question No. 3.

There are numerous other assignments of error, a discussion of which, by reason of the length that this opinion has attained, we forego, but which we overrule.

For the reason that we think the $50,000 indebtedness sued on herein, and evidenced by notes, is not of the character mentioned in article 6625, Revised Statutes, we find that the appellee is not entitled to recover same by virtue of said statute.

For the reason that we think that item of $53,000 herein sued on is of the character mentioned in said statute, we find that appellee is entitled to recover herein as to said item by virtue of said statute.

For the reason that the evidence sustains the verdict of the jury as to legal fraud, we affirm the judgment of the trial court in its entirety.

Affirmed.